Lawrence J. **DEUTSCH**, Plaintiff,

v.

**HEALTH INSURANCE PLAN OF GREATER NEW YORK,**
Defendant.

No. 83 CIV 1279 (LBS).

United States District Court, S.D. New York.

Oct. 28, 1983.

Lord, Day & Lord, New York City, for plaintiff; John D. Gordan, III, New York City, of counsel.

Stroock & Stroock & Lavan, New York City, for defendant; Edward R. Korman, Madelaine R. Berg, New York City, of counsel.

OPINION ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT AND PLAINTIFF'S CROSS MOTION FOR PARTIAL SUMMARY JUDGMENT.

SAND, District Judge.

The plaintiff, Dr. Lawrence J. Deutsch, has brought this action for breach of contract and misrepresentation in connection

with a contract he entered into with defendant Health Insurance Plan of Greater New York ("HIP"), under which he was to provide defendant with medical testing services. Defendant has moved pursuant to Fed.R.Civ.P. 56 for summary judgment, or, in the alternative, partial summary judgment. Plaintiff has cross moved for partial summary judgment with respect to those issues that defendant has raised in its motion and the first two affirmative defenses asserted in defendant's amended answer.

For the reasons stated herein, defendant's motion for summary judgment is denied and its motion for partial summary judgment is granted with respect to plaintiff's claim for misrepresentation arising out of events occurring after July 1, 1982. As to all other issues, plaintiff's cross motion for partial summary judgment is granted.

We also hold that Dr. Deutsch's recovery for breach of contract should not be diminished by the amount of the patient fees he would have had to pay to his medical partners.

*Facts*

The following facts are treated as undisputed for purposes of this motion, except where otherwise noted. Defendant HIP is a "health maintenance organization" that provides medical services to subscribers in the Greater New York area. HIP subscribers remit a periodic premium to HIP in exchange for which they are entitled to health care at one of HIP's "medical groups"—"independent"[1] physician partnerships and professional corporations under contract with HIP. When specialized treatment is required that cannot be provided by the subscriber's regular medical group, the subscriber is referred to an outside specialist approved by HIP's Medical Control Board.

The plaintiff has been an audiologist[2] for the last twenty years. Audiology testing is one of the services for which HIP retains specialists outside of its regular medical groups. On June 4, 1980, Dr. Deutsch entered into a contract with HIP under which he was granted "the exclusive right" (subject to one limited exception[3]) "to furnish to it all audiological services which it may require." (¶ 1). In exchange for his services, Dr. Deutsch was to receive a fee of $32.00 per patient.

The agreement was to run from July 1, 1980 to June 30, 1982. However, it was subject to automatic renewal for an additional two-year period unless HIP notified Dr. Deutsch in writing at least sixty days prior to the termination date that it did not wish to continue. HIP also had the ability to terminate the contract at any time if its Medical Control Board determined that Dr. Deutsch's services were "professionally substandard."[4] Dr. Deutsch was empowered to cancel the agreement at any time on sixty days' notice. The contract also provided for the renegotiation of the patient fees at the time of renewal.[5]

Plaintiff alleges that in May of 1980, prior to the signing of the contract, representatives of the East Nassau Medical Group, a HIP affiliate, learned of its provisions and objected to the requirement that they send their audiology patients to Dr. Deutsch. East Nassau apparently had been utilizing another audiologist for some time, and did not wish to change allegiance. Dr. Deutsch alleges that these objections were not disclosed to him prior to the sign-

---

1. For purposes of this motion, plaintiff does not concede that the HIP medical groups are independent of HIP (Plaintiff's "3(g) Statement" ¶ 1(b)).

2. Audiology is the study of hearing and the rehabilitation of impaired hearing.

3. The contract allowed Ms. Edna Dvosin, an audiologist previously used by HIP, to perform the same number of audiological exams during each of the two years of the agreement as she had performed during the preceding twelve months.

4. HIP was required to give Dr. Deutsch notice and an opportunity to be heard as to this determination, as well as a 30-day period in which to correct any alleged deficiencies.

5. The parties are apparently in dispute as to whether the contract required renegotiation for the renewal to become effective or merely permitted it. See *infra* § 3.

ing of the contract, although he did, of course, learn of them shortly thereafter. Initial efforts to resolve this dispute proved unavailing, and Dr. Deutsch commenced performance of the contract without receiving any referrals from the East Nassau Group.[6]

At various times in the months that followed, Dr. Deutsch complained to HIP that he was not receiving all of the referrals he had been promised. However, he did not bring or specifically threaten a lawsuit. The parties have advanced two different reasons for this forebearance: first, that Dr. Deutsch believed that he could work out matters amicably with HIP, and, second, that he did not want to jeopardize the renewal of the contract.[7]

Neither Dr. Deutsch nor HIP took any action to prevent the automatic renewal of the agreement on July 1, 1982. Nor did the parties seek renegotiation of the patient referral fees at that time, as they were contractually empowered to do. Dr. Deutsch continued to receive HIP patients and $32.00 fees after the renewal date, although not, of course, from the East Nassau Group.

This action was brought in February, 1983. The amended complaint asserts two causes of action. The first seeks contractual damages for the fees that Dr. Deutsch did not receive with respect to the audiology patients from the East Nassau Medical Group. The second claim sounds in fraud. Plaintiff asserts that, as the result of defendant's allegedly knowing misrepresentation that he would receive all of HIP's audiology patients, he agreed to accept a lower per-patient fee and expended funds for office space in Brooklyn and Great Neck, New York that he would not otherwise have needed. Plaintiff has also asserted a claim for punitive damages based upon this alleged fraud.

## Discussion

Defendant has asserted five grounds in support of its motion. One would dispose of the plaintiff's entire claim. Three would prevent him from recovering any damages for the renewal term of the contract (after July 1, 1982). The fifth would strike only his misrepresentation claim for the renewal term of the contract. We treat these arguments in the order outlined above.

### 1. HIP's right to terminate the contract at will.

HIP's first argument is that its contract with Dr. Deutsch was terminable at will as a matter of public policy. This conclusion rests by analogy upon the law of attorney-client relationships under which a client may terminate a retainer agreement at any time without cause. E.g., *Demov, Morris, Levin & Shein v. Glantz*, 53 N.Y.2d 553, 556, 428 N.E.2d 387, 389, 444 N.Y.S.2d 55, 57 (1981).

Although no New York case supports the view, HIP reasons that a similar principle must obtain with respect to the physician-patient relationship. Moreover, the argument continues, where one physician contracts to make referrals to another, the same policy considerations would make

---

**6.** Plaintiff has also alleged that at some point he did not get all the audiology referrals from the HIP Brooklyn Medical Group, and that Ms. Edna Dvosin, who was permitted to do a limited number of audiology tests for HIP (see supra n. 3) performed five times the number she was entitled to do (Plaintiff's Memorandum of Law 13–16).

**7.** Both these explanations draw support from Dr. Deutsch's deposition testimony. At one point, in response to a question why he did not sue HIP sooner, Dr. Deutsch responded,

I never ever wanted to sue anybody. All I wanted to do was convince the powers that be that we were entitled to that work and we were prepared to do it and wanted to do it,

and I made a business decision that the way to approach ... HIP on this is the way I did, and I persisted in this behavior believing that this was the only hope I had of accomplishing this. I didn't want a lawsuit. I wanted to do what I was contracted to do and I wanted to. (Deutsch Dep.Tr. 157).

Q: Did you deliberately wait until after the 60-day period in which HIP was required to give notice of termination before you threatened to bring a lawsuit?

A: Yes, I did.

Q: And that was because of your concern that it would affect the renewal?

A: Yes.

(*Id.* at 175–76).

that agreement freely terminable as well. Therefore, HIP concludes, the East Nassau Medical Group had an absolute right not to refer patients to Dr. Deutsch despite the contractual provisions to the contrary.[8]

Although, as noted, no New York case addresses this question, a line of authority from other jurisdictions contradicts defendant's position. In *Cobb County-Kennestone Hospital Authority v. Prince,* 242 Ga. 139, 249 S.E.2d 581 (1978), the Supreme Court of Georgia upheld hospital regulations limiting the staff physicians' selection as to the equipment on which certain diagnostic tests could be performed. Other cases[9] have upheld similar regulations restricting the use of hospital equipment to an individual physician or group of physicians to the exclusion of the rest of the hospital staff. The effect of such regulations is to require that certain tests, if they are to be performed at all in the hospital, must be performed by the designated physicians rather than by the physician of the patient's choice. Therefore, the plaintiff argues, by analogy the HIP medical groups could be contractually limited in their choice of audiologists to Dr. Deutsch.

■■■ Defendant contends that the *Cobb County* doctrine is inapposite to this case because it does not deal with the question whether such exclusive medical referral arrangements are terminable at will by one of the parties. We read *Cobb County* and similar cases, however, to stand for the general proposition that the right of patients or referring physicians to choose a specialist may be limited or waived by contract—at least with respect to a standardized testing procedure limited in scope and duration. Obviously, there would be no point in holding that a right could be waived contractually if the waiver could be unilaterally terminated and the right reasserted at any time. HIP's signing of an exclusive referral contract with Dr. Deutsch therefore waived any right HIP might otherwise have had to choose another audiologist.

We would also note that, to the extent HIP relies upon the East Nassau Medical Group's purported right to choose an audiologist, its arguments are misplaced. The issue here is Dr. Deutsch's rights as against HIP, *not* the nature or binding effect of the East Nassau Group's contractual obligations. Therefore, whether the East Nassau Medical Group was required, under its agreement with HIP, to abide by HIP's choice of audiologists is totally unavailing as a defense to HIP in an action on its contract with Dr. Deutsch.[10]

2. *HIP's contractual breach as an objection to renewal.*

■■ HIP's next argument is that its apparent breach of contract with Dr. Deutsch during the first two year period operated effectively as notice that HIP would not renew the contract on July 1, 1982. Defendant cites the case of *Custen v. Robinson,* 180 A.D. 384, 167 N.Y.S. 1013 (1st Dept.1917) in support of this contention. In *Custen,* the defendant entered into a

---

**8.** Though not directly relevant to our determination, we cannot help observing that this argument, if correct, would be anathema to HIP's entire means of doing business. If all medical treatment and referral contracts were freely terminable by one of the parties, presumably any of HIP's subscribers, medical groups, or outside specialists could avoid any of their contractual obligations to the company at any time.

**9.** The *Cobb County* opinion cited authority to this effect from the Supreme Courts of Colorado, Minnesota, and Pennsylvania and from state appellate courts in Arizona and California. *Radiology Professional Corp. v. Trinidad Area Health Ass'n,* 195 Colo. 253, 577 P.2d 748 (1978); *Benell v. City of Virginia,* 258 Minn. 559, 104 N.W.2d 633 (1960); *Alder v. Montefiore Hospital*

*Ass'n of W. Pa.,* 453 Pa. 60, 311 A.2d 634 (1973), *cert. denied,* 414 U.S. 1131, 94 S.Ct. 870, 38 L.Ed.2d 755 (1974); *Dattilo v. Tucson General Hospital,* 23 Ariz.App. 392, 533 P.2d 700 (1975); *Letsch v. Northern San Diego County Hospital District,* 246 Cal.App.2d 673, 55 Cal.Rptr. 118 (1966); *Blank v. Palo-Alto-Stanford Hospital Center,* 234 Cal.App.2d 377, 44 Cal.Rptr. 572 (1965).

**10.** This reasoning assumes that HIP and the East Nassau Group are separate legal entities—an issue which is currently in dispute. *See supra* note 1. If we assume the converse, then HIP fares no better because East Nassau would then be bound by HIP's contract with Dr. Deutsch.

contract for the delivery of yarn to the plaintiff, which the plaintiff was to manufacture into bobbins. The contract was to run for one and a half years and was subject to automatic renewal for an additional year unless either party objected to such renewal before the first term of the contract expired. Approximately seven months after the contract commenced, the defendants refused to make any further deliveries of yarn, which refusal, the trial court found, constituted a breach. Moreover, the lower court reasoned, since defendants had not objected to the renewal of the contract, they were liable for damages, not only for the remainder of the original contract term, but also for the one year renewal period.

The appellate division sustained the lower court's finding on liability, but reversed its award of damages for the one year renewal period. The court reasoned that defendant's refusal to have any further dealings with plaintiff during the original term of the contract effectively communicated its desire not to renew.

This case is distinguishable from *Custen* in several important respects. Here, far from refusing to have any further dealings with the plaintiff, defendants continued to refer patients to him and to pay him his fees during the full initial term of the contract. Moreover, the parties continued their relationship beyond the renewal date of July 1, 1982. Therefore, defendant's assertion that the contract was not renewed flies in the face of its own unambiguous conduct.

It may nevertheless be possible to argue that the failure of some medical groups to refer patients to Dr. Deutsch constituted a partial repudiation of the contract and, to the extent repudiated, the contract was not renewed. We believe that such an argu-

ment would stretch the *Custen* doctrine too far.

In *Custen*, defendant's repudiation operated to exercise a power that the contract expressly gave them—*i.e.*, to refuse to renew the contract *in toto*.[11] Nowhere in the present contract, however, was HIP empowered to renew only part of the contract or unilaterally to strike certain provisions, such as the exclusivity clause. The greater power to cancel an entire contract in this case cannot include the lesser power to cancel selected portions of it and treat what remains as being in full effect.

### 3. Failure of the contract to state a material term.

█ HIP next contends that no enforceable contract existed between the parties after July 1, 1982 because of the failure of the agreement to state a material term. This theory is based upon paragraph 7(a) of the contract, which provides:

> At least sixty (60) days prior to the expiration of this agreement, HIP shall notify Dr. Deutsch in writing, in the manner set forth in Paragraph 7(a), of its intention not to renew this agreement; otherwise this agreement shall be deemed further renewed from and after July 1, 1982 for an additional two year period, *subject to renegotiation of patient visit fees.*

(emphasis added). The defendant seizes upon the language "subject to renegotiation" as indicating that there was only an agreement to agree on the price term and that the instrument is therefore unenforceable.

This argument presupposes that renegotiation was a condition precedent to the renewal of the contract. A more plausible interpretation of paragraph 7(a), which plaintiff urges,[12] is that the parties were

---

**11.** The same is true with the other cases cited by HIP. *Rochdale Village v. Public Employees Union, Local No. 80,* 605 F.2d 1290 (2d Cir.1979); *Stanley v. Chris-Craft Corp.,* 21 N.Y.S.2d 898 (S.Ct. Orange County 1939), *aff'd* 259 A.D. 1038, 21 N.Y.S.2d 502 (1940).

**12.** The plaintiff has submitted an affidavit in opposition to defendant's motion stating that the renegotiation clause was put in the contract

as a means of allowing Dr. Deutsch to seek a higher per-patient fee in the event of increased expenses. Defendant has submitted no evidence in support of its position, although it has attempted to argue that Dr. Deutsch's interpretation is inherently implausible. (Defendant's Reply Memorandum 27–28). Indeed, an affidavit submitted in support of HIP's estoppel claim by Bernard J. Neeck, HIP's Senior Vice President of Finance, seems to reflect a clear under-

merely permitted to seek renegotiation at the time of renewal—not that renewal was contingent upon a further agreement.[13] Under this view, there was no indefiniteness because the terms of the original contract were merely continued. *Long Island Railroad Co. v. Northville Industries Corp.*, 41 N.Y.2d 455, 463, 362 N.E.2d 558, 563, 393 N.Y.S.2d 925, 930 (1977).

Once again, we believe that defendant's argument is untenable in light of its conduct in its performance of this contract. It is undisputed that after July 1, 1982, HIP continued to refer patients to Dr. Deutsch, continued to remit the $32.00 patient fee to him, and in all other respects treated the contract as remaining in full force and effect. We believe that defendant should be bound as a matter of law to the practical construction that it itself has placed on the contract. It would be ludicrous to allow HIP to contend that, because of the lack of renegotiation of the patient fees, it understood its obligations to be at an end on July 1, 1982.

The hoary case cited by HIP of *United Press v. New York Press*, 164 N.Y. 406, 58 N.E. 527 (1900) is not to the contrary. There, a contract providing for payments "not exceeding three hundred dollars during each and every week" was held unenforceable for indefiniteness notwithstanding that defendant had established a consistent pattern of making weekly payments of $300. The court held that the obvious indefiniteness of the contractual language could not be cured by reference to the conduct of the parties.

In this case, however, as previously noted, the real issue is whether the parties intended the contract to continue in the absence of renegotiation—not what the terms of the renewal were to be. There being no genuine dispute as to whether renewal of the contract was contingent upon renegotiation of the patient fees, partial summary judgment may be granted for the plaintiff on this issue.

### 4. *HIP's estoppel claim.*

■ The next ground for summary judgment asserted by HIP is that plaintiff should be estopped from claiming damages for the renewal term of the contract because he did not inform HIP of his intention to sue them prior to the time at which HIP could object to contract's renewal. In the defendant's view, Deutsch "connived" to insure that the contract would be renewed and is thereby estopped from claiming damages accruing to him after the renewal. We agree with the plaintiff that this argument is deficient both on the facts and the law.

In the first place, there is evidence (which we must accept as true for purposes of defendant's partial summary judgment motion) that the plaintiff did inform Dr. Jesse Jampol, a director of HIP, in June of 1980 that he would sue if he did not receive referrals from the East Nassau Medical Group.[14] Moreover, undisputed evidence shows that Deutsch repeatedly complained about the East Nassau situation to the HIP hierarchy although he intentionally did not

---

standing that the contract was renewed on July 1, 1982.

**13.** Defendant claims that a similar view was rejected in *Joseph Martin Jr., Delicatessen, Inc. v. Schumacher*, 52 N.Y.2d 105, 417 N.E.2d 541, 436 N.Y.S.2d 247 (1981). In that case, however, a realty lease provided for renewal at a rent "to be agreed upon." *Id.* at 109, 436 N.Y.S.2d 247, 417 N.E.2d 541. The court was thus left to determine, if it was to enforce the contract, what constituted "a reasonable rent." *Id.* at 110, 436 N.Y.S.2d 247, 417 N.E.2d 541. This determination the court declined to make.

Our task here is different. We do not need to establish the price term based upon our own

evaluations (as in *Joseph Martin*) or based upon the conduct of the parties (as in *United Press v. New York Press*, 164 N.Y. 406, 58 N.E. 527 (1900)). We only need determine whether the parties intended the contract renewed *with its original price term* in the absence of renegotiation.

**14.** This threat was allegedly made to Dr. Jesse Jampol, who was a director of both HIP and the East Nassau Medical Group. (Deutsch Dep.Tr. 147–48). We would also note that, under the terms of the contract, HIP was empowered to prevent renewal of this contract at any time 60 days prior to July, 1982. Therefore, if this threat were actually made in June of 1980, HIP

threaten a lawsuit.[15] HIP has dismissed these latter communications as "casual reminders."

Even accepting this characterization, and assuming that there is a legally significant distinction between "casual reminders" and more forceful assertions, HIP cannot make out a claim for estoppel under the law of New York.

The elements of equitable estoppel fall into two categories: those that relate to the party sought to be estopped, and those that relate to the party asserting the estoppel. The essential elements relating to the party to be estopped are: (1) conduct which amounts to a false representation or concealment of material facts or which gives the impression that the facts are otherwise than as asserted, (2) intention or expectation that such conduct would be relied upon by the other party, and (3) actual or constructive knowledge of the real facts. The elements relating to the party asserting the estoppel are: (1) lack of knowledge and the means of acquiring knowledge of the real facts, (2) reliance on the conduct of the party to be estopped, and (3) action based thereon resulting in a prejudicial change of position. *State Bank of Albany v. Fioravanti*, 70 App.Div.2d 1011, 1012–13, 418 N.Y.S.2d 202, 203–04 (3d Dep't 1979), *quoting New York State Guernsey Breeders' Co-operative, Inc. v. Noyes*, 260 App.Div. 240, 248, 22 N.Y. S.2d 132, 140 (3d Dep't), *modified*, 284 N.Y. 197, 30 N.E.2d 471 (1940).

*United States v. Bedford Associates*, 491 F.Supp. 851, 866–67 (S.D.N.Y.1980), *aff'd in pertinent part*, 657 F.2d 1300 (2d Cir. 1981), *cert. denied*, 456 U.S. 914, 102 S.Ct. 1767, 72 L.Ed.2d 173 (1982).

With respect to HIP, the party asserting the estoppel, there is significant doubt as to the necessary element of reliance—*i.e.,* that HIP relied on Deutsch's failure to threaten suit in renewing the contract.[16] Even were we to assume this element, however, we do not believe that HIP lacked "the means of acquiring knowledge of the real facts."

HIP is chargeable with knowledge of the provisions of the contract that it signed. It therefore cannot be heard to complain that it was unaware of the terms of the renewal clause. Moreover, HIP had actual knowledge that Dr. Deutsch was not receiving all of the referrals promised to him in the contract and that he was insisting (however "casually") that his rights be enforced. It was hardly beyond HIP's ability, then, as a legally sophisticated business entity, to surmise that it faced the substantial possibility of a lawsuit and that failure to cancel the agreement would increase its potential liability.

■ Similarly, Dr. Deutsch's conduct does not give rise to a claim of estoppel. As previously noted, to be estopped a party must engage in "conduct which amounts to a false representation or concealment of material facts or which gives rise to the impression that the facts are otherwise than as asserted." *United States v. Bedford Associates, supra*. The "fact" that defendant alleges Dr. Deutsch misrepresented or concealed was his intention to sue to enforce his contractual rights. However, defendant cites no authority in support of the extraordinary proposition that a party's litigation plans are "facts" that must be affirmatively disclosed to an adversary to permit the later assertion of his

could have prevented renewal of the contract even at that early date.

**15.** As noted (n. 7, *supra*), two different explanations have been advanced for this forebearance: that Dr. Deutsch wished to work out matters amicably with HIP and that he did not want to jeopardize renewal of the contract.

**16.** From all that appears, there was some confusion at HIP in the spring and early summer of 1982 about the terms of the contract. Defend-

ant has conceded that no one at HIP affirmatively relied on the lack of threats by Dr. Deutsch to bring a lawsuit (Defendant's Reply Memorandum 23). Instead the argument runs, had Dr. Deutsch threatened a lawsuit, it would have flagged the issue to HIP's attention, which would have allowed HIP to have taken appropriate action. This speculation certainly cannot establish the necessary reliance element as a matter of law with respect to HIP's motion for partial summary judgment.

potential claims. We agree with the plaintiff that the only "facts" that Dr. Deutsch had the duty not to misrepresent or conceal were those supporting the legal theories on which he now relies. No claim of such concealment has been or could be made in this case.

■ We would also note that we see no fundamental infirmity, under principles of either law or equity, in the plaintiff's position that he did not want the contract terminated, even though he had full knowledge of the defendant's breach. We do not believe that Dr. Deutsch, in order to assert a claim for all of the performance he was promised, was required to forego such benefits as he was actually receiving.[17]

### 5. Waiver of plaintiff's misrepresentation claim.

■ Although finding that plaintiff is not precluded from asserting a claim for contractual breach beyond July 1, 1982, we nonetheless agree with defendant that Dr. Deutsch's desire for and acquiescence in the renewal of the contract on its original terms effectively waives his misrepresentation claim for that period.

■ Under the law of New York, reliance by the plaintiff on defendant's false assertions of fact is a necessary element to a claim of misrepresentation. See, e.g., Jo Ann Homes at Bellmore, Inc. v. Dworetz, 25 N.Y.2d 112, 119, 302 N.Y.S.2d 799, 803, 250 N.E.2d 214, 217 (1969). The gravamen of fraud claim in this case is that defendant falsely represented that Dr. Deutsch would be receiving all of HIP's audiological referrals, in reliance on which he agreed to accept a $32.00 fee per patient and made

certain expenditures.[18] Had he known HIP's true intentions, plaintiff asserts, he would not have made the expenditures in question and would have insisted on more than $32.00 per patient.

■ Defendant cites authority for the proposition that when a party voluntarily renews a contract with knowledge of fraud, he has waived his claim of misrepresentation. Elliott v. Brady, 192 N.Y. 221, 85 N.E. 69 (1908); Oleet v. Pennsylvania Exchange Bank, 285 A.D. 411, 137 N.Y.S.2d 779 (1st Dep't 1955). Plaintiff has sought to distinguish these cases on the grounds that, first, this case involved continuation of an old agreement rather than commencement of a new one and, second, that Dr. Deutsch was financially constrained to seek this continuation. The latter argument fails because Dr. Deutsch's economic situation is irrelevant for our purposes unless it is shown that HIP exerted control over his business or property so as to compel him to renew the contract. E.g., Oleet v. Pennsylvania Exchange Bank, supra at 414, 137 N.Y.S.2d at 782. Plainly that is not the case here.

Plaintiff's other attempt to distinguish the Elliott and Oleet cases has more substance. We have already commented that the contract was not so much "renewed" on July 1, 1982 as much as it was simply continued by reason of HIP's failure to cancel it. The fact remains, however, that Dr. Deutsch voluntarily chose not to seek renegotiation of his patient fees from HIP.[19] We believe that this failure is fatal to plaintiff's fraud claim, because it negatives the effect of defendant's alleged misrepresentation at the original time of con-

---

**17.** Defendant argues that plaintiff had no expectation at the time of contracting that the agreement would continue beyond the second year and therefore cannot claim expectation damages for that period. We disagree.

Under the terms of the contract, neither party was required to take any affirmative steps to renew this agreement. Instead, renewal occurred automatically in the absence of an objection by HIP. From plaintiff's perspective, therefore, this agreement is more properly characterized as a four year contract that HIP could cancel after two years, and that he could cancel at any time.

**18.** These additional expenditures relate to the opening and maintenance of office space in Brooklyn and Great Neck, New York to handle referrals from the East Nassau Group.

**19.** Dr. Deutsch testified in his deposition that he did not seek renegotiation of the patient fees at the time of renewal

(b)ecause at that point I felt that based on what I had learned in the first two years that it was feasible for us to continue to operate at that figure for two more years.

(Deutsch Dep.Tr. 85).

tracting on the per-patient rates obtaining after the renewal.[20] Stated somewhat differently, plaintiff cannot claim that he acted in reliance on defendant's alleged fraud in failing to renegotiate his compensation because prior to the renewal date, he had full knowledge of the true facts.

We see no inconsistency between this holding and our previous observation that plaintiff had every right to seek continuation of the contract and later assert his claim for breach. While we would not impose upon the plaintiff the obligation to cancel the contract or to advise defendant of his plans to bring a lawsuit, we do not believe that after learning the truth, he can acquiesce in the renewal of the contract on the same terms previously obtaining and claim that he was defrauded into accepting those terms.

### 6. *Damages.*

The parties have also requested guidance from the Court at this time on certain damage issues.

From February 1980 to December 1982, Dr. Deutsch was a partner in a medical firm called Great Neck Audiology Associates. Although Dr. Deutsch contracted with HIP in his individual capacity, had the East Nassau Medical Group referred its audiology patients to him, they would apparently have been tested by the offices of this partnership in Great Neck. Under the terms of his partnership agreement, Dr. Deutsch would have been required to pay a $20.00 portion of the $32.00 testing fees to his medical partners.[21] The issue currently before the court is whether Dr. Deutsch's potential damage award must be reduced by this amount.

Defendant argues that its apparent breach of contract "saved (Dr. Deutsch) the $20.00 per examination that he would have expended in order to comply with his obligations under the contract." (Memorandum on Damages 16). The $20.00 portion of the $32.00 fee therefore represents, HIP contends, the cost of performing the contract and not a compensable part of a contractual damage claim. *E.g., Ware Bros. Co. v. Cortland Cart & Carriage Co.,* 192 N.Y. 439, 442 (1908). We disagree.

Dr. Deutsch's contractual obligations to his partners do not, we believe, represent the cost to him of performing the contract. It is of no avail to HIP that third persons, not parties to the contract[22] or to this litigation, would have had a claim against Dr. Deutsch for part of the money it was obligated to pay him.[23] We do not believe, for example, that a seller of real estate who contracted with a broker could successfully argue, in a breach of contract action, that since the broker was a member of a partnership and obligated to contribute earnings to it, the broker's remedy for breach is limited to that broker's share of

**20.** We assume that the only basis upon which plaintiff claims damages for misrepresentation for the renewal period is that his patient fee of $32.00 remained below what it would have been absent the alleged fraud. Needless to say, plaintiff could not recover any expenses that he incurred after learning of HIP's alleged breach, because the necessary element of reliance would be missing as to those expenditures.

**21.** HIP has alleged that this arrangement constituted fee-splitting in violation of N.Y.Educ.Law § 6509–a (McKinney 1972, Pocket Part 1982–83). This Court has, this same day, issued an opinion rejecting this contention.

**22.** As previously noted, Dr. Deutsch contracted with HIP in his individual capacity, not on behalf of Great Neck Audiology Associates.

**23.** This holding will not result in a windfall to Dr. Deutsch. Presumably, his partners could maintain an action for an accounting against him with respect to any portion of a damage award he might receive from HIP that was owing to them under their partnership agreement. We note, however, that under the terms of sale of Dr. Deutsch's partnership interest in Great Neck Audiology Associates, the partnership released any rights it might have to "any future payments which LAWRENCE J. DEUTSCH may receive from HIP arising from such contract, whether for damages arising prior or to the date hereof or subsequent hereto." (Contract of Sale of December 9, 1982, ¶ 9). Dr. Deutsch received $10,000 for his share of partnership instead of $25,000 provided in partnership agreement. This $15,000 difference presumably reflects the value that Dr. Deutsch and his partners assigned to Great Neck Audiology Associates' claims in regard to the HIP contract, discounted by the uncertainties and delay entailed by litigation.

the partnership profit in the commission. Cf. *Kennedy v. George Cully Real Estate, Inc.,* 336 So.2d 484, 486 (Fla.App.1976) (action by real estate broker for tortious interference with contractual relations) ("If there are obligations upon the plaintiff for a payment of a part of the commission, they remain the obligations of the plaintiff and do not diminish the damages recoverable.").

This is not to say, of course, that Dr. Deutsch can recover the full contract price of $32.00 for every audiology patient of the East Nassau Medical Group. His award of contractual damages must still be reduced by the cost of performing the contract. There is no basis for the Court now to conclude what items comprise the cost of performance or how much they amount to. We have only held that the partnership shares of his partners at Great Neck Audiology Associates are not one such cost.

We decline at this time to reach the other issues raised by HIP in its lengthy Memorandum on Damages. Many of these issues involve disputed questions of fact and, in any event, are beyond the scope of this Court's authorized submissions. Moreover, we would be remiss to decide issues of such import to this litigation without responsive papers from the plaintiff.

SO ORDERED.