**SANITOY, INC. and Pilgrim Infants Products, Inc., Plaintiffs,**

v.

**Richard SHAPIRO, Defendant.**

**No. 85 Civ. 6473 (MGC).**

United States District Court, S.D. New York.

Jan. 30, 1989.

Jacobs Persinger & Parker by William Lasher, New York City, for plaintiffs.

Hofheimer Gartlir & Gross by Sylvia D. Garland, New York City, for defendant.

OPINION AND ORDER

CEDARBAUM, District Judge.

Plaintiffs, Sanitoy, Inc. and Pilgrim Infants Products, Inc., have brought this action seeking damages against defendant Richard Shapiro for his allegedly fraudulent and negligent misrepresentations concerning the quality and manufacture of certain infant plush toys, and for his al-

leged violation of Consumer Product and Safety Commission ("CPSC") standards regulating those toys. Defendant has moved for summary judgment. After reviewing the undisputed facts and other facts offered by plaintiffs, and drawing all inferences in plaintiffs' favor, the motion for summary judgment is granted in part and denied in part.

## THE UNDISPUTED FACTS

Sanitoy, Inc. and its wholly-owned subsidiary Pilgrim Infants Products, Inc. are Delaware corporations with principal places of business in Fitchburg, Massachusetts. Plaintiffs manufacture, import, and distribute infant products, including toys. Richard Shapiro, who resides in New York, is a salesman of toy products and the managing director of Richard Toy Company Ltd., a Hong Kong corporation. Shapiro and his wife are the sole shareholders of Richard Toy Company.

In late 1982, Shapiro contacted Sanitoy concerning the sale of infant plush toys, which Sanitoy would then resell to retailers. Shapiro had never before had business dealings with Sanitoy or Pilgrim or with any of their officers or employees. For their part, Sanitoy and Pilgrim had had only limited experience with plush toys prior to meeting Shapiro.

Shapiro subsequently attended three meetings at Sanitoy's offices with several of Sanitoy's officers and employees, including Arthur Zadek, Sanitoy's president, and J. Daniel Simon, Sanitoy's executive vice-president. Shapiro brought to these meetings samples of the toys, which he said were manufactured in Korea, and left them with Sanitoy for its inspection. For purposes of this motion, Shapiro concedes that he made the following representations at these meetings:

(1) that he would direct and supervise production of high quality infant plush products in the Far East;

(2) that such products would be in full conformity with applicable trade standards and CPSC rules and regulations for resale in the United States; and

(3) that Sanitoy and Pilgrim could rely on his personal expertise and abilities for the delivery of high-quality infant plush products.

In December of 1982, Sanitoy and Pilgrim placed three purchase orders with Shapiro. The purchase orders and corresponding letters of credit were made out to Richard Toy Company, Ltd., which plaintiffs understood to be Shapiro's company. Richard Toy Company in turn contracted with the Song Won Trading Company in Korea to manufacture the toys. The merchandise, shipped F.O.B. Korea, arrived in the United States in May of 1983. Plaintiffs do not claim that they have incurred any damages in connection with the first three purchase orders.

On April 7, 1983, Sanitoy placed its fourth purchase order, P.O. # 77287, for 6,000 dozen style 101–A plush, two-headed, toy dumbells. Sanitoy intended to resell this merchandise to K–Mart, one of its major customers. Like the first three orders, the fourth purchase order did not specify the CPSC standards that the toys would have to meet to be acceptable for introduction into interstate commerce in the United States. However, all of the purchase order forms contained pre-printed "terms and conditions" which included language to the effect that the seller would guarantee compliance with all relevant laws and regulations. In May of 1983, Zadek visited the factories in Korea where the dumbells were being manufactured, but did not undertake a thorough inspection of the facilities or of the merchandise in its various stages of production. The first shipment of merchandise ordered under P.O. # 77287 arrived at Sanitoy's warehouse at the end of June, 1983.

When Sanitoy conducted tests on the dumbells to check for compliance with CPSC standards, it discovered that the eyes on most of the dumbells were not sufficiently securely attached to comply. On July 1, 1983, Sanitoy contacted Shapiro with this information. The parties subsequently decided to return the merchandise to Korea for repair. Richard Toy Company assumed the costs of repair, although Sani-

toy paid some of the shipping and surveyor charges. The repaired merchandise arrived at Sanitoy's warehouse in the spring of 1984.

After Sanitoy had placed the fourth purchase order, plaintiffs placed fifteen additional orders with Richard Toy Company. Nine of the fifteen were placed after Sanitoy had received the defective shipment.

Several of the fifteen orders included style 101–A dumbells. The only shipment that plaintiffs refused to accept in its entirety was the shipment of style 101–A dumbells received under the fourth purchase order. However, plaintiffs claim that two of the later orders, P.O. #77289 and P.O. #1589, dated April 26, 1984, also contained many defective toys that plaintiffs were unable to sell to retailers.

Plaintiffs filed the complaint in August of 1985. Count One of the complaint alleges common law fraud based on plaintiffs' reliance on Shapiro's representations in deciding to purchase the plush toys. Count Two asserts that Shapiro should be held liable for negligent misrepresentation because of his claimed expertise in plush toys and plaintiffs' relative inexperience. Plaintiffs allege in Count Three that Shapiro is liable to them for violation of CPSC regulations. The original complaint also contained two counts alleging injury to Sanitoy's relationship with K–Mart, but these counts have been withdrawn. After the completion of discovery, Shapiro moved for summary judgment on the three remaining counts. All parties agree that New York law is the substantive law governing the common law claims, Counts One and Two of the complaint.[1]

## SUMMARY JUDGMENT

A court will grant summary judgment if it determines "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Knight v. United States Fire Insurance Co.*, 804 F.2d 9, 11 (2d Cir.1986), *cert.*

*denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). The test for granting a summary judgment motion is similar to that for directing a verdict, in that if the trier of fact could return a verdict for the nonmoving party, the motion should not be granted. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). On the other hand, a court is not precluded from granting the motion simply because the nonmoving party has established that there is an issue of material fact. The nonmoving party must show that the issue of fact is "genuine," involving more than mere "metaphysical doubt." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Murray v. Xerox Corp.*, 811 F.2d 118, 121 (2d Cir.1987).

In determining whether a case should proceed to trial, a court must review the record in the light most favorable to the nonmoving party, resolving ambiguities and drawing reasonable inferences in that party's favor. *Patrick v. LeFevre,* 745 F.2d 153, 158 (2d Cir.1984). But if, after adequate time for discovery has passed, the nonmoving party fails to establish the existence of an essential element of its case, on which it will bear the burden of proof at trial, the court should enter summary judgment against it. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548 at 2552, 91 L.Ed.2d 265 (1986). In that situation, "there can be no 'genuine issue of material fact,' since a complete failure of proof ... necessarily renders all other facts immaterial." *Id.* at 323, 106 S.Ct. at 2553.

## DISCUSSION

### *Negligent Misrepresentation*

■ New York law generally does not recognize liability for words "negligently spoken" during commercial dealings. The exception is "when the parties' relationship suggests a closer degree of trust and reliance than that of the ordinary buyer and

---

**1.** *Cf. Colgate Palmolive Co. v. S/S Dart Canada,* 724 F.2d 313, 317 (2d Cir.1983), *cert. denied,* 466 U.S. 963, 104 S.Ct. 2181, 80 L.Ed.2d 562 (1984)

(in absence of proof to contrary, New York court will assume that another state's common law is the same as its own.)

seller." *American Protein Corp. v. AB Volvo*, 844 F.2d 56, 63 (2d Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 136, 102 L.Ed.2d 109 (1988) (quoting *Coolite Corp. v. American Cyanamid Co.*, 52 A.D.2d 486, 384 N.Y.S.2d 808, 811 (1st Dep't 1976)). Defendant argues that plaintiffs cannot establish the "special relationship" necessary for actionable negligent misrepresentation because plaintiffs' relationship with him was never more than that of ordinary buyer and seller. Plaintiffs argue that defendant's expertise and assurances concerning infant plush toys, and their own relative inexperience in this area, created a special relationship.

In support of their claim of negligent misrepresentation, plaintiffs rely primarily on *White v. Guarente*, 43 N.Y.2d 356, 401 N.Y.S.2d 474, 372 N.E.2d 315 (1977), *Coolite Corp. v. American Cyanamid Co.*, 52 A.D.2d 486, 384 N.Y.S.2d 808 (1st Dep't 1976), and *Mathis v. Yondata*, 125 Misc.2d 383, 480 N.Y.S.2d 173 (N.Y.Sup.Ct.1984). In each of these cases, the court found a special relationship which would support a claim of negligent misrepresentation. An analysis of these cases shows that plaintiffs' reliance is misplaced.

The facts of *White* are not analogous. In *White*, the New York Court of Appeals found a sufficiently close relationship between the defendant, an accounting firm, and the plaintiff, a limited partner of the partnership which was a client of the accounting firm, to recognize "some relation of duty" beyond the exact terms of the agreement to audit the partnership. Specifically, the accountants knew that the limited partners would receive and rely on the auditor's report. The court did not broadly examine all circumstances "arising out of contract or otherwise," 43 N.Y.2d at 363, 401 N.Y.S.2d at 478, 372 N.E.2d at 320, which might give rise to a duty of care, but instead specifically considered when a third party beneficiary of a service contract may seek damages for fraud.

In *Coolite*, the court imposed a duty of care on the defendant because the defendant had required the plaintiffs to form a new company with solid capitalization before the parties could enter a distributorship agreement for the sale of "light sticks." The court found that the plaintiffs' investment of $500,000 "attest[ed] the parties' relationship was intrinsically a more intimate relationship association, at least in terms of reliance and trustworthiness, *than that of the commonly encountered buyer and seller.*" 384 N.Y.S.2d at 811 (emphasis added). By contrast, Sanitoy and Pilgrim did not commit themselves to any expenditure which could be considered unusual for a commonly encountered buyer, nor did they commit themselves to the long-term relationship of a distributorship agreement.

*Mathis* is also distinguishable. In that case, the defendants had contracted to provide the plaintiffs with data processing services. A year later, they attempted to induce the plaintiffs not to cancel the contract by promising to sell them certain computer equipment after developing the software necessary for the plaintiffs' business. Thus, this was not a simple contract for the sale of goods, but an agreement to supply services on an ongoing basis. In denying the defendants' summary judgment motion, the court held that the promises, representations, and warranties made for the purpose of guiding the plaintiffs in their business transactions created a special relationship between the parties.

The relationship between merchants who buy and sell goods, in contrast to a distributorship or service arrangement, is not the special relationship required by New York law as an essential element of a claim of negligent misrepresentation. If, as plaintiffs contend, a salesman's representation that the buyer can rely on his expertise and the buyer's reliance were enough to create the necessary special relationship, the exception would swallow the rule. After all factual inferences are drawn in plaintiffs' favor, plaintiffs' claim of negligent misrepresentation could not withstand a motion for a directed verdict. Therefore, defendant's motion for summary judgment on this claim is granted.

## 156

### Fraudulent Misrepresentation

Under New York law, in order to succeed on their fraud claim, plaintiffs must prove the following six elements by clear and convincing evidence: (1) that Shapiro made a misrepresentation as to a material fact; (2) that the representation was false and (3) known by Shapiro to be false; (4) that the representation was made for the purpose of inducing the plaintiffs to rely on it; (5) that the plaintiffs, in ignorance of its falsity, rightfully did so rely; and (6) that plaintiffs' reliance on Shapiro's misrepresentations caused them injury. *See Murray v. Xerox Corp.*, 811 F.2d 118, 121 (2d Cir. 1987); *Channel Master Corp. v. Aluminum Limited Sales, Inc.*, 4 N.Y.2d 403, 176 N.Y.S.2d 259, 151 N.E.2d 833 (1958); *Brown v. Lockwood*, 76 A.D.2d 721, 730, 432 N.Y.S.2d 186 (2d Dep't 1980).

In their 3(g) statement, plaintiffs assert that defendant misrepresented the quality of the toys, including their comparability to another well-known line, misrepresented his ability to supervise the manufacture of the toys, and misrepresented both his knowledge of applicable CPSC regulations and that the toys would conform to those regulations. Plaintiffs also assert that after they discovered the defects in the fourth purchase order, defendant continually reassured them that the defects and the allegedly low quality of those toys and of toys ordered under later purchase orders would be corrected, but that this never happened.

■ Defendant contends that plaintiffs have waived any cause of action for fraud by their placement of additional orders with Richard Toy Company after having received the defective goods under the fourth purchase order, by returning the defective merchandise for repair, and by selling the repaired toys and the later shipments to retailers. He also argues that the plaintiffs could not justifiably have relied on his representations, that any representations as to quality or conformity with CPSC regulations constituted nonactionable opinion or prediction, and that he did not have the necessary scienter to make any of his statements actionable in fraud.

Many cases have held that if a plaintiff continues to deal with a defendant after discovering the truth of the defendant's misrepresentations, the plaintiff waives any fraud claim for damages arising subsequent to the discovery. *See, e.g., Deutsch v. Health Insurance Plan of Greater New York*, 573 F.Supp. 1433 (S.D.N.Y.1983); *Lumber Industries, Inc. v. Woodlawn Furniture Corp.*, 26 A.D.2d 924, 274 N.Y. S.2d 813 (1st Dep't 1966); *Oleet v. Pennsylvania Exchange Bank*, 285 A.D. 411, 137 N.Y.S.2d 779 (1st Dep't 1955). The basis for finding waiver with respect to later business dealings is that a plaintiff's knowledge of the true facts precludes it from being able to satisfy all of the elements of fraud. Specifically, with respect to new transactions after falsity has been revealed, a plaintiff cannot claim justifiable reliance on the earlier misrepresentations. *See Deutsch*, 573 F.Supp. at 1442; *Long Island Lighting Co. v. Imo Delaval, Inc.*, 668 F.Supp. 237, 240 (S.D.N.Y.1987).

When a plaintiff has incurred damages both before and after learning the truth, a court may grant recovery for damages sustained during the former period and disallow post-discovery damages. For example, in *Accusystems. Inc. v. Honeywell Information Systems*, 580 F.Supp. 474, 483 (S.D.N.Y.1984), the court concluded that because the defendant had misrepresented the capabilities of its computer operating system, the plaintiffs could recover for fraud. But since the plaintiffs could have discontinued using the system after they realized the truth, the court limited recoverable damages to exclude damages arising after that time. Similarly, in *Clearview Concrete Products v. S. Charles Gherardi, Inc.*, 88 A.D.2d 461, 453 N.Y.S.2d 750 (2d Dep't 1982), the court precluded recovery of sums spent after the plaintiff had accepted the benefits of a contract originally based on the defendants' misrepresentations, although the plaintiff could have recovered "prediscovery expenses" if it had been able to establish any. *Id.* 453 N.Y. S.2d at 755.

Plaintiffs assert that they have incurred damages both as a direct result of defend-

ant's original misrepresentations and even after they learned the truth, because they have been unable to sell the low quality and defective toys to retailers, and because they incurred charges in returning the fourth purchase order to Korea. While plaintiffs have not completely waived their fraud claim, since some of their damages were incurred before they learned the truth, or are otherwise directly attributable to the consequences of receiving the defective fourth purchase order, they could not justifiably have relied on defendant's original representations when they placed two purchase orders in April of 1984. Thus, they may not use the early representations as a basis for recovery of damages arising from the later orders.

But plaintiffs also base their claim for damages from the later purchase orders on defendant's later assurances that the toys' quality would improve and that the toys ordered later would not be defective. These later representations are insufficient to "revive" the claim for damages that the plaintiffs have waived because plaintiffs had already discovered that they could not believe defendant's representations about the quality of goods. Even if these repeated assurances were actionable misrepresentations and not mere puffery, plaintiffs could not reasonably have relied on them as truthful.

■ Defendant argues that even if plaintiffs did not waive their fraud claim as to damages incurred before they received the defective toys, his original representations are not actionable in fraud because they involved opinion and prediction, not present fact, and because the plaintiffs could not justifiably have relied on them. However, factual issues preclude summary judgment on the initial alleged misrepresentations.

In general, representations involving opinion, such as the quality of an object or service, are not actionable in fraud because they do not provide a reasonable ground for reliance. *See George Backer Management Corp. v. Acme Quilting Corp.*, 46 N.Y.2d 211, 413 N.Y.S.2d 135, 140, 385 N.E.2d 1062 (1978); *Paladino v. Adelphi University*, 89 A.D.2d 85, 454 N.Y.S.2d 868, 874 (2d Dep't 1982). But not only did defendant extol the high quality of his products when he first met with plaintiffs, he also represented that they compared favorably to Eden Toy, a specifically identified line of plush toys. Plaintiffs have testified that Eden Toy is one of the industry leaders in infant plush toys and that they relied on defendant's comparison in deciding to place their orders with him. (Zadek Dep. 41, Simon Dep. 46). In *Stern v. Satra*, 539 F.2d 1305 (2d Cir.1976), the court noted that an opinion may constitute grounds for fraud if it is made in reference "to some commonly accepted measure." 539 F.2d at 1308 (quoting *Taylor v. Burr Printing Co.*, 26 F.2d 331, 334 (2d Cir.) (L. Hand, J.), *cert. denied*, 278 U.S. 641, 49 S.Ct. 36, 73 L.Ed. 556 (1928)). Eden Toy may provide such a measure here.

In addition, although defendant's representations that he would supervise the toys' manufacture and that they would conform to CPSC regulations were statements of future intent and prediction, they are nevertheless actionable if defendant made them with the present intent to deceive, a question of fact involving state of mind. *See Murray v. Xerox Corp.*, 811 F.2d 118, 122 (2d Cir.1987); *Schwartz v. Newsweek*, 653 F.Supp. 384, 389 (S.D.N.Y.1986), *aff'd*, 827 F.2d 879 (2d Cir.1987); *Lanzi v. Brooks*, 54 A.D.2d 1057, 388 N.Y.S.2d 946, 948 (3d Dep't 1976), *aff'd*, 43 N.Y.2d 778, 402 N.Y.S.2d 384, 373 N.E.2d 278 (1977).

The Second Circuit has recently observed that "summary judgment is ordinarily inappropriate where an individual's intent and state of mind are implicated." *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460– (2d Cir.1989) (citations omitted). Here, plaintiffs have offered proof which raises an issue of fact as to defendant's initial intent to deceive.

For example, defendant has conceded that Richard Toy Company did not choose any of the subcontractors who worked for Song Won, and that he did not know all of the subcontractors who worked on the infant plush line. (Shapiro Dep. 15–16). Furthermore, defendant has acknowledged that he did not know all of the applicable

CPSC regulations when he met with the plaintiffs, but relied on the plaintiffs to inform him of them. (Shapiro Dep. 84, 97–98).

Finally, whether plaintiffs justifiably relied on defendant's original representations also presents a genuine issue of material fact. Whether a plaintiff may justifiably rely on a representation depends on whether the plaintiff "was placed on guard or practically faced with the facts," *Mallis v. Bankers Trust Co.*, 615 F.2d 68, 81 (2d Cir.1980), *cert. denied*, 449 U.S. 1123, 101 S.Ct. 938, 67 L.Ed.2d 109 (1981), or whether the facts were "peculiarly within the defendant's knowledge." *See Black v. Chittenden*, 69 N.Y.2d 665, 511 N.Y.S.2d 833, 835, 503 N.E.2d 1370, 1372 (1986) (citations omitted).

Plaintiffs contend that they reasonably relied on defendant because they considered him an expert in plush toys while they themselves were inexperienced and had no means of obtaining the knowledge to test his representations. Plaintiffs knew defendant by reputation and considered him "a very fine salesman" representing "a very fine company." (Zadek Dep. 45). They had not distributed many plush toys before meeting defendant, and were reluctant to purchase toys from Korea because they had had an unpleasant experience with a different supplier. (Simon Dep. 26–28). Plaintiffs knew that defendant's company was in Hong Kong, even if he lived in New York, so that it would not have been unthinkable for them to believe that he could supervise the production of Korean-made toys. These circumstances raise an issue of fact as to whether plaintiffs should have been placed on guard and examined defendant's representations more closely.

In sum, defendant is not entitled to summary judgment on plaintiffs' fraud claim in its entirety, but only to the extent that it includes damages relating to the later purchase orders. Summary judgment is denied with respect to the claim arising from the fourth purchase order.

*CPSC Violations*

■ In Count Three of the complaint, plaintiffs allege that because the defective merchandise failed to comply with CPSC rules and regulations, plaintiffs suffered economic injury in that the merchandise was either unsaleable or required repair before it became saleable. Plaintiffs base their claim on 15 U.S.C. § 2072, § 23(a) of the Consumer Product Safety Act, which provides that:

> Any person who shall sustain injury by reason of any knowing (including willful) violation of a consumer product safety rule, or any other rule or order issued by the Commission may sue any person who knowingly (including willfully) violated any such rule or order in any district court of the United States in the district in which the defendant resides or is found or has an agent....

15 U.S.C. § 2072(a) (1982).

Defendant contends that plaintiffs have no standing to sue under 15 U.S.C. § 2072 for two reasons. First, he argues that the governing regulation, 16 C.F.R. § 1500.18(a)(9), which bans infant toys which present a "choking, aspiration, or ingestion hazard because of small parts ... and which [are] introduced into interstate commerce after January 1, 1980," does not apply to him. Under the regulation, "a toy or children's article manufactured outside the United States is introduced into interstate commerce when it is first brought within a U.S. port of entry." *Id.* Defendant argues that since the toys were shipped F.O.B. Korea, title had passed to plaintiffs before the toys were introduced into interstate commerce. Second, defendant contends that § 2072 is limited to suits for personal injury and does not authorize a private action for economic harm.

The Consumer Product Safety Act, Pub. L. No. 92–573, 15 U.S.C. § 2051 et seq., was enacted in 1972. Its first stated purpose is to "protect the public against unreasonable risks of injury associated with consumer products." 15 U.S.C. § 2051(b)(1) (1982). Although the words of 15 U.S.C. § 2072, § 23(a) of the Act, do not expressly define the type of injury for which a pri-

vate right of action is provided, or explicitly identify the "persons" whom Congress intended to include, the legislative history shows that Congress believed that it was creating a private federal remedy for injured consumers.

The language of § 2072, which refers to "any person," is arguably broad enough to include plaintiffs' claim. But the scope of the provision is ambiguous because of the absence of an express definition of "injury." A review of the legislative history is appropriate because "a thing may be within the letter of the statute and yet not within its spirit, nor within the intention of its makers." *Church of The Holy Trinity v. United States,* 143 U.S. 457, 459, 12 S.Ct. 511, 512, 36 L.Ed. 226 (1892).

The floor debates in the House of Representatives focused on whether the provision would overburden the federal courts by allowing any consumer who had suffered a personal injury to sue in a federal forum. *See* 118 Cong.Rec. 31,383–87. For example, despite Representative Eckhardt's reassurances that "the burden would be on the plaintiff first to show that the victim died or sustained personal injury ... or became ill," Representative Jonas predicted that "you will have the Federal courts filled up with a multitude of suits involving very small sums of money against retailers all over the United States." *Id.* at 31,384.

Plaintiffs cite one case in which it was held that an insulation supplier and installer could sue an insulation manufacturer and its distributor for economic injury under § 2072, *Griswold Insulation Co. v. Lula Cotton Processing Co.,* 540 F.Supp. 1334 (M.D.Tenn.1982). In that case the court relied upon 15 U.S.C. § 2082, a provision added to the statute six years after the adoption of § 2072. Section 2082 is directed exclusively to cellulose insulation, and has no apparent connection with the private remedy created by § 2072.

The *Griswold* case is not persuasive on the critical issue—what was Congress' intention in enacting § 2072. The legislative history provides no basis for concluding that Congress intended that § 2072 would

provide a federal right of action for wholesale distributors against manufacturers, or for purely economic injury. *Compare* 15 U.S.C. § 2073 (1982) (allowing "any interested person" to seek injunctive relief to enforce product safety rule). On the contrary, the floor debates show that Congress was aware that § 2072 would burden the federal courts, but nevertheless wished to create a federal remedy only for injured consumers.

Since plaintiffs are not injured consumers, they do not have a right to sue under § 2072. In view of that conclusion, I do not reach defendant's contention about the significance of title to the toys or the question of whether defendant, as distinguished from Richard Toy Company or Song Won, can be said to have "violated" a rule of the CPSC.

Defendant's motion for summary judgment on Count Three of the complaint is granted.

### CONCLUSION

For the reasons discussed above, defendant's motion for summary judgment is granted in part and denied in part. Settle order on notice by February 3, 1989.

SO ORDERED.