UNITED STATES STEEL AND CARNEGIE PENSION FUND, INC., Connecticut Mutual Life Insurance Company, and the National Bank of Commerce of Dallas (as Trustee of the Omega-Alpha, Inc. Pool Trust), Plaintiffs-Appellants,

v.

Henry ORENSTEIN, First National City Bank, Hayden Stone Inc., Bernstein-Macauley, Inc., Roger S. Berlind, and Sanford I. Weill, Defendants,

and

First National City Bank, Defendant-Appellee.

No. 878, Docket 76–7528.

United States Court of Appeals, Second Circuit.

Argued April 27, 1977.

Decided June 16, 1977.

---

Robert A. Bicks, New York City (Joseph P. Dailey, Randall T. Sims and Breed, Abbott & Morgan, New York City, of counsel), for plaintiffs-appellants.

W. Foster Wollen, New York City (Michael W. Lillie, Barbara Bamford, Thomas M. Geisler, Jr., and Shearman & Sterling, New York City, of counsel), for defendant-appellee.

Before MEDINA and OAKES, Circuit Judges, and MISHLER, District Judge.*

PER CURIAM:

In 1971, Topper Corporation, then the fifth largest domestic toy manufacturer, proposed a private placement of convertible subordinate debentures in order to reduce its over-advanced position under a $20 million, non-notification, revolving loan agreement with the First National City Bank ("Citibank"). With the aid of Hayden Stone, Inc., a leading investment banker, and Arthur Young & Co., a large firm of certified public accountants, both a Private Placement Memorandum and public offering prospectus were drawn for distribution to potential participants. In July, 1971, the opportunity was brought to the attention of Henry Thompson, the investment manager of the United States Steel and Carnegie Pension Fund ("Pension Fund"). Thompson, a seasoned securities analyst, considered the placement a potentially sound Fund investment and set out on a month long investigation of Topper's financial posture.

The company's audited financial statements for fiscal year 1970 and the interim statements for the first half of 1971 to which Thompson first turned revealed a financially stable company which was experiencing steady profits and increased sales. In actuality, however, Topper was laboring under serious financial problems. Their year-end figures had been inflated by $14 million in December shipments under what was known as the "Spring 1971 Program"; while treated as part of the 1970 sales, the merchandise was invoiced on extended credit terms. Thompson knew of these machinations and understood that profits were tied to the company's ability to collect on the accounts receivable, but he was unaware of Topper's hidden marketing practice of granting concessions to customers who were unable to sell their products at retail. Although Thompson was repeatedly assured by Hayden Stone and Topper officials that the "Spring 1971 Program" was faring well, Topper's products were in fact stockpiling on retailer's shelves. In mid-1971, Topper began to extend credits on the unsold toys which in effect eliminated much of the accounts receivable. This policy was never revealed to Citibank officials who believed Topper was

* Of the Eastern District of New York, sitting by designation.

experiencing usual seasonal difficulty in collecting on past due accounts.

During his visit to the Topper plant in August, 1971, Thompson learned that Citibank was the firm's principal financier and that Edward Waldman, a bank vice-president, administered the $20 million revolving loan. Thompson contacted one Walter Jeffers, another Citibank officer, who was in charge of the Pension Fund's accounts under a long term custodial agreement pursuant to which Citibank administered the Fund's assets and provided quarterly investment advice. Thompson requested that Jeffers have Waldman call him.

On August 27, 1971, Waldman called Thompson and a five-minute conversation ensued which became the basis of this litigation. Waldman voiced confidence in the company's management; while he expressed the belief that Henry Orenstein, the firm's president, was chiefly responsible for Topper's growth, Waldman noted that Topper's financial officers had tight control over audits and had done an excellent job estimating production costs. More importantly, Waldman indicated that the Topper account had long been satisfactory, and that he neither knew of, nor foresaw any problems. Waldman, however, refused to commit himself upon Thompson's request for investment advice.

His investigation complete, Thompson reported favorably on the Topper placement, and in September 1971, appellants invested $5.25 million in the convertible debentures. The company's hidden reliance on consignment sales, however, led to its financial collapse; in May, 1973, Topper was adjudged a bankrupt. Appellants thereafter commenced this action[1] charging Citibank with violations of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and § 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a) and common law fraud. Appellants alleged that Waldman, aware that Citibank was to receive the proceeds of the private placement, deliberately misled Thompson into believing that Topper was in a sound financial state. Appellants argued

that although Waldman knew of the sharp rise in past due accounts receivable and Topper's faltering sales, he failed to disclose the information in violation of the securities laws and his fiduciary duty under the Citibank-Pension Fund investment contract.

The district court, rejecting appellant's claims, specifically found that Waldman had responded to Thompson's inquiry both honestly and in good faith; it further found that there was neither occasion for Waldman to engage in any philosophical conversation on Topper's business practices nor any reason for him to believe that Thompson was seeking advice under the then prevailing investment contract. The district court's findings are amply supported by the evidence. There was no evidence that Waldman knew of Topper's concession practices before the placement. Collections in past years had similarly run well behind projections, and the seasonal nature of the business had caused the percentage of past due accounts to rise in previous summers. An official of Citibank broached the subject of the overdue accounts with Orenstein during the summer of 1971, only to accept his assurances that it would be competitively unsound to press for collections during the slow summer months and before the advent of a new line.

It appears that Thompson was in the best position to discover Topper's financial instability. The firm's customer contracts and regularly prepared account control documents were available for his inspection; Thompson simply never reviewed them. Moreover, unlike Citibank which was constrained by the non-notification arrangement, Thompson had direct access to Topper's customers. Yet, he never questioned them as to the finality of Topper's sales.

When the five minute conversation is properly viewed in the context of Thompson's month long investigation, it is reasonable to conclude that Thompson's inquiry was but a mere credit check and not a request for investment advice. The Pension Fund-Citibank investment contract

<hr>

1. All other defendants settled before trial.

contemplated only quarterly meetings where the bank's then current investment policies on publicly traded securities were discussed. Notably, when Thompson informed his superior that he asked Waldman his opinion of the placement, Thompson was told he had no right to make that inquiry. Significantly Thompson made only passing reference to the Waldman conversation in drawing his recommendation memorandum for the Fund's Finance Committee.

Appellants argue that once Waldman agreed to provide information on Topper's financial condition, he was required to make a full and fair disclosure. Their reliance on *Mid-States Insurance Co. v. American Fidelity & Casualty Co.,* 234 F.2d 721 (9th Cir. 1956) and *Bowman & Bourdon, Inc. v. Rohr,* 296 F.Supp. 847 (D.Mass), *aff'd,* 417 F.2d 780 (1st Cir. 1969) is misplaced. Those cases involved deceptive statements by a seller or insider. Citibank was neither an insider nor a participant in the placement of the loan. That Citibank stood to receive the proceeds from the placement was made clear in the Private Placement Memorandum.

Thompson carried on an exhaustive investigation which led him and the Fund's Finance Committee to believe the placement was a sound investment. Ford Motor Credit Company evidently shared appellants' belief in Topper's financial stability, as it extended a $7 million loan about the same time the private placement was effected. The case presented only fact questions which were resolved against appellants.

Affirmed.