**CONGRESS FINANCIAL CORPORATION,**
Plaintiff,

v.

**JOHN MORRELL & CO., Defendant.**

**No. 90 Civ. 7191 (RPP).**

United States District Court,
S.D. New York.

April 20, 1992.

460

Otterbourg, Steindler, Houston & Rosen, P.C. by Bernard Beitel, Richard Haddad, New York City, for plaintiff.

Townley & Updike by Jerome P. Coleman, Zvi N. Raskin, Robert A. Isler, New York City, for defendant.

## OPINION AND ORDER

ROBERT P. PATTERSON, JR., District Judge.

This is an action for damages alleging breach of contract. Having completed discovery, Plaintiff moves pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment on its first claim. For the reasons set forth below, Plaintiff's motion is granted.

## BACKGROUND

### I. INTRODUCTION

The key figures in this action are Plaintiff Congress Financial Corporation ("Congress"), a factoring and financing company; Defendant John Morrell & Co. ("Morrell"), a meat packer; and non-party Dinner Bell Foods, Inc. ("Dinner Bell"),[1] a meat packer with principal operations in Defiance and Troy, Ohio.

In June 1988, a corporation controlled by Joshua Leibovitz, with financial support from Citicorp Venture Capital, Ltd. ("Citicorp"), acquired control of Dinner Bell in a leveraged buy-out. Institutional financing for Dinner Bell was provided by a term loan from Glenfed Financial Corporation ("Glenfed") and by a three year revolving credit facility supplied by Congress. Glenfed's term loan was secured by a first lien on Dinner Bell's fixed assets, including its equipment, machinery, real estate, patents, and trademarks. Congress' revolving credit facility was secured by a first lien on Dinner Bell's accounts receivable, inventory, work in process, and other miscellaneous assets. Congress and Glenfed each received a junior lien on the collateral pledged by Dinner Bell to the other.

The Congress revolving credit facility commenced on June 3, 1988 with a "credit line," or upward limit, set at $15 million.[2] The actual funding available to Dinner Bell at any given time was calculated by a formula which factored in certain collateral on hand at Dinner Bell (the "Advance Formula"). The Advance Formula permitted loans to Dinner Bell equal to the sum of 85% of its eligible accounts receivable, 65% of its eligible product inventory, and 30% of its eligible supplies. To assist Congress in its calculation of funds available under the Advance Formula, Dinner Bell provided Congress with daily "Loan Collateral Reports," which set forth Dinner Bell's outstanding loan balance, its accounts receivable, its product inventory, and its supplies inventory. Because these amounts varied from day to day, Dinner Bell's financing eligibility varied on a daily basis.[3] The Advance Formula remained in effect and unchanged until Dinner Bell filed for bankruptcy on October 17, 1990.

### II. THE DINNER BELL–MORRELL ACQUISITION

After the leveraged buy-out, Dinner Bell's business declined substantially, and financial difficulties resulted. In the Spring of 1990, Dinner Bell began seeking a purchaser for certain of its assets, and Citicorp, Dinner Bell, and Morrell began negotiations toward such a sale. Pursuant to those negotiations, on July 25, 1990, Morrell issued Dinner Bell a "Letter of Intent" for the purchase of Dinner Bell's plant in Wilson, North Carolina and all of the intellectual property used in connection with Dinner Bell's business. On August 1, 1990, a team of Morrell representatives commenced an on-site review of Dinner Bell's business and operations. Although this review was denominated in a Morrell document as "Due Diligence,"[4] Morrell dis-

---

1. On October 3, 1990 Dinner Bell changed its name to B.J. Packing, Inc.

2. The credit line was later reduced to $12 million.

3. For example, in the month of September 1990, the advances ranged from a high of $855,247.29 on September 14 to a low of $75,704.30 on September 27.

4. An August 1, 1990 Morrell memorandum setting forth the information which Morrell wanted to gather during its review of Dinner Bell is entitled "Dinner Bell Due Diligence." Reply Affidavit of Edwin Stern, sworn to on January 22, 1992 ("Stern Rep. Aff.") Exh. B.

putes whether this review was sufficiently thorough to constitute "due diligence."

The transaction formally closed on October 2, 1990, at which time the following agreements were signed by Dinner Bell, Morrell, and Congress.

### A. Asset Acquisition Agreement

Dinner Bell and Morrell entered into an "Asset Acquisition Agreement" wherein Morrell purchased Dinner Bell's Wilson, North Carolina plant, all of the intellectual property used in connection with Dinner Bell's business, and certain other assets. The purchase price consisted of $3,990,000 in cash to be delivered on closing; $500,000 to be paid on the first anniversary of the closing date, less any amounts owing from Dinner Bell to Morrell resulting from Dinner Bell's breach of any agreement with Morrell; and a five cent ($.05) per pound royalty on all processed meat sales subsequently made by Morrell under the Dinner Bell name up to a maximum of $12 million.

### B. Co–Pack Agreements

Morrell and Dinner Bell entered into two separate "Co–Pack Agreements" involving the post-closing purchase by Morrell of Dinner Bell products. The Co–Pack Agreements were to remain in effect while Morrell transferred Dinner Bell's packing operations to its own plants. One Co–Pack agreement was to terminate in 60 days; the other was to remain in effect indefinitely, but could be terminated with notice after 120 days.

### C. Congress/Morrell Agreement

Congress, Dinner Bell, and Morrell entered into the "Congress/Morrell Agreement." In consideration for the release by Congress of its security interests in and liens upon the Dinner Bell intellectual property and related assets sold by Dinner Bell to Morrell, Morrell acknowledged that Congress had a perfected security interest in and liens upon Dinner Bell's collateral for the revolving credit facility, including Dinner Bell's accounts receivable and inventory. Morrell agreed, *inter alia*, to pay to Congress within four days of receipt all invoices rendered by Dinner Bell for products purchased, received, and re-sold by Morrell, without offset, claim, counterclaim, or deduction.

### D. Financing Amendment

Congress and Dinner Bell also signed a letter agreement entitled "Amendment to and Termination of Financing Agreements" (the "Financing Amendment") reflecting the terms pursuant to which Congress would continue to extend financing to Dinner Bell until November 30, 1990.

## III. EVENTS SURROUNDING THE PARTIES' CLAIMS

On September 29, 1990, just prior to the closing, Dinner Bell conducted its customary fiscal year-end (September 30) inventory at its two Ohio plants. The memorandum setting forth the procedures to be followed during the inventory included procedures specifically requested by Morrell. Dinner Bell representatives did the actual inventory count, and Dinner Bell's accountants, Ernst & Young, were present observing. Both Congress and Morrell also sent representatives to observe the inventory. Morrell sent a four person team headed by its Assistant Corporate Controller to the Defiance plant. A second Morrell team headed by Morrell's Cost Controller went to the Troy plant. Pl. 3(g) Stmt. ¶¶ 35–36. Because no Congress personnel were available, Congress engaged Richard J. Kaminski, an accountant and former employee of a Congress subsidiary, as its representative. Mr. Kaminski was present at the Defiance plant on September 29, and he went to the Troy plant the following day. Affidavit of Edwin E. Stern, sworn to on November 14, 1991 ("Stern Aff."), ¶ 19; Pl. 3(g) Stmt. ¶ 36.

On Monday, October 1, 1990, Mr. Kaminski returned to the Defiance plant to meet with Dinner Bell's controller, Bob Kenhast, to familiarize himself with the pricing information that would be reflected in the year-end inventory report to be finalized by Dinner Bell a few weeks after the scheduled closing on October 2, 1990. While waiting to see Mr. Kenhast, Mr. Kaminski

proceeded to do a "rough reconciliation" of a prior month's inventory to make himself familiar with the records. For this purpose, Dinner Bell provided him with its internal August month-end priced physical inventory report and the August 31, 1990 Loan Collateral Report which had been sent to Congress. Deposition of Richard Kaminski of August 13, 1991 ("Kaminski Dep.") at 104–5. He also received Dinner Bell's unaudited September 1, 1990 financial statement, which Dinner Bell had sent to Morrell on September 19, 1990. Stern Aff. ¶ 20; Affidavit of Bernard Beitel, sworn to on November 14, 1991, Exh. 8.

Mr. Kaminski was unable to reconcile his calculation of "priced" inventory as stated on the internal inventory report with the Loan Collateral Report, finding that the figure on the Loan Collateral Report exceeded that on the internal inventory report by $501,000. Kaminski Dep. at 108.

That afternoon, Mr. Kaminski called Edwin Stern, a Senior Vice President of Congress, related that he was unable to reconcile the inventory as priced, and reported that he had asked a Dinner Bell employee, Dave Beck, for a reconciliation. Mr. Kaminski testified that he did not state to Mr. Stern that Dinner Bell had overstated its inventory on the Loan Collateral Report, but rather, "I told him I had inability to reconcile these numbers and we both agreed to give it to Dave Beck to have him reconcile it by the time we got back or I got back." Kaminski Dep. at 108–9.

Mr. Stern states that after speaking with Mr. Kaminski, he placed a telephone call to Richard Mayberry of Citicorp and advised him of Mr. Kaminski's inability to reconcile the August month-end reports. Stern Aff. With Mr. Stern still on the telephone, Mr. Mayberry placed a telephone call to Stan Frieze, a "crisis manager" who was then running Dinner Bell's operations and who was in Ohio for the closing. Mr. Mayberry instructed Mr. Frieze to follow up on the matter and to provide the reconciliation to Congress. Mr. Stern states that he "did not reach any conclusion about the quantity of the inventory on October 1, 1990 because of the question raised by Kaminski." Stern Rep. Aff. ¶¶ 19–23.

Mr. Frieze testified that Mr. Stern did not tell him that there were overstatements of inventory by Dinner Bell on the Loan Collateral Reports, but only that an auditor had noticed a discrepancy between the two reports. He testified that the matter was referred to the Dinner Bell controller to resolve the discrepancy. Nowhere in his deposition does Mr. Frieze indicate that prior to the closing either he or anyone from Morrell concluded that Dinner Bell had been overstating its inventory on the Loan Collateral Reports. Deposition of Stan Frieze of April 22, 1991 ("Frieze Dep.") at 69–71.

On October 1, 1990, Congress advanced Dinner Bell $528,000, and on October 2, 1990, the day of the closing, it advanced Dinner Bell $101,000 based on the Loan Collateral Reports sent on those days. On October 3, 1990, the day after the closing, Mr. Frieze sent a memo to Dinner Bell's owners reporting Dinner Bell's discovery that for over a year its former chief financial officer had been systematically overstating Dinner Bell's inventory on the Loan Collateral Reports sent to Congress. Affidavit of Jerome Coleman, sworn to on January 15, 1992, Exh. 6. This information was communicated to Congress and Morrell that same day. When Dinner Bell adjusted the inventory level reported on the Loan Collateral Reports to account for this overstatement, the level of financing for which Dinner Bell was eligible under the Advance Formula was reduced substantially. Dinner Bell received only about $18,000 from Congress on the day after the closing. Congress did not, however, modify the Advance Formula, and it continued to advance funds to Dinner Bell. For example, on October 10, 1990, Congress advanced some $100,000 to Dinner Bell.

Morrell paid Dinner Bell $3,900,000 on the day of the closing. That money was used by Dinner Bell as follows: $2,500,000 was delivered to Glenfed; approximately $1.1 million was used to pay selected past due accounts payable and to repay selected other debts; the balance of approximately

$400,000 was to be used by Dinner Bell as working capital, but was withdrawn by Chemical Bank to cover overdrafts on Dinner Bell's checking account. Pl. 3(g) Stmt. ¶ 42. It is not disputed that Congress was not to receive, and did not receive, any portion of the Morrell payments at the closing. Pl. 3(g) Stmt. ¶ 41.

Despite this influx of cash, as a result of its deteriorated financial condition Dinner Bell was unable to continue to purchase raw materials needed for production. On October 17, 1990, Dinner Bell declared bankruptcy, ceased operations, and stopped performing its Co–Pack Agreements with Morrell.

Before declaring bankruptcy, however, Dinner Bell had processed its remaining inventory and delivered finished products to its former customers for the account of Morrell. The 34 invoices for these products totalled $2,706,854.36, and Dinner Bell billed Morrell for this amount. Pursuant to the revolving credit facility and the Congress/Morrell Agreement, Dinner Bell assigned the invoices to Congress. Under the Congress/Morrell Agreement, payment was due to Congress from Morrell four days after receipt of the invoices.

On October 5, 1990, Morrell Senior Vice President Mark Littman notified Mr. Stern that Morrell had verified receipt of $450,-428.38 in products from Dinner Bell and was wire transferring that amount to Congress. This represented the amount due from one invoice. During the next several days, Mr. Stern spoke to Mr. Littman and inquired about further payments due from Morrell. Mr. Littman responded that Morrell had not yet verified receipt of additional products. By October 15, 1990, when Congress had not received any further payments from Morrell, and Mr. Stern was unable to ascertain from Morrell when payment of the balance was forthcoming, Congress served a demand for payment on Morrell. On October 16, 1990, Morrell responded that it was refusing to pay any of the other invoices. Congress instituted this action immediately thereafter. Whether Morrell continued to receive the benefit and profits of deliveries of Dinner Bell products to Morrell customers, but failed to disclose to Congress its intent not to pay for those products is not established.

Congress charges that after applying certain credits, there remains a balance due from Morrell of $1,876,809.31. Congress now moves for summary judgment against Morrell with respect to this claim.[5] Morrell offers no evidence that this balance is incorrect, but instead maintains that it has valid offsets and counterclaims against Congress.

## IV. MORRELL'S DEFENSES AND COUNTERCLAIMS

It its answer, Morrell alleged as affirmative defenses and counterclaims: that prior to the closing, and at least once in September 1990, Congress conducted an examination of Dinner Bell's inventory; that Congress learned that Dinner Bell's inventory was less than Dinner Bell had represented to Morrell; that Congress did not disclose to Morrell that Dinner Bell had overstated its inventory to Morrell; that this failure to disclose caused Morrell to enter into a transaction it would not have entered into had it known the inventory was overstated; and that this failure to disclose constituted negligence, fraud, or breach of the implied covenant of good faith and fair dealing in the Congress/Morrell Agreement.

Congress moved for summary judgment with respect to the defenses and counterclaims asserted in Morrell's answer. Morrell's answering papers on this motion provide no support for essential elements of the claims asserted in its answer: that Congress conducted an examination of Dinner Bell's inventory, that Congress learned that Dinner Bell's inventory was less than Dinner Bell had represented to Morrell, and that Dinner Bell's inventory was in fact overstated in reports to Morrell. The Dinner Bell–Morrell transaction did not involve the purchase of Dinner Bell's inventory by

---

**5.** In its second cause of action, Congress charged that Morrell was required to and failed to purchase certain additional inventory valued at over $400,000. Congress does not move for summary judgment with respect to this claim.

Morrell, and Thomas Davis, a Morrell Senior Vice President, states that Morrell was "not particularly interested in the [Dinner Bell] inventory levels." Deposition of Thomas Davis of May 16, 1991 ("Davis Dep.") at 22.

In its motion papers, however, Morrell sets forth a different theory from that asserted in its answer.[6] Morrell maintains that Congress' discovery of the discrepancy in the priced inventory reported in the August 31, 1990 Loan Collateral Report was material information in light of an alleged oral agreement between Congress and Morrell that Congress' level of financing of Dinner Bell after the closing would be comparable to its level prior to the closing. Def. Br. at 5–7. Morrell asserts that the continued financing of Dinner Bell by Congress was essential to ensure that Dinner Bell could continue its operations and comply with the terms of the Dinner Bell–Morrell Co–Pack Agreements. Mr. Davis states that:

A crucial element in the success of the co-pack agreements was Congress' continued financing of Dinner Bell so as to allow Dinner Bell to have sufficient working capital to purchase raw materials for production and sale.

While Congress did not initially not want to continue providing such financing to Dinner Bell, I—and other Morrell personnel—informed Congress and Dinner Bell on several occasions that Morrell would not continue to pursue the deal if Congress' financing of Dinner Bell did not remain intact after the closing on October ·2, 1990. These discussions were between Mark Littman, Henry Thoman and me, for Morrell, and Edwin Stern and Robert Miller for Congress, and Stanley Frieze, for Dinner Bell.

\* \* \* \* \* \*

After intense negotiations on this issue of continued financing by Congress, Congress relented and agreed to provide the continued financing of the *type and amounts regularly advanced in order to allow the co-pack agreement to succeed.*

Affidavit of Thomas Davis, sworn to on January 13, 1992 ("Davis Aff.") ¶¶ 8–11 (emphasis added). Morrell argues that it would never have executed the closing agreements if Congress' financing was not to be maintained at a level sufficient to allow Dinner Bell to continue to operate throughout the duration of the Co–Pack Agreements.[7] Def. Br. at 7. Morrell also states that had it been aware of the inventory overstatement or discrepancy in the August 31, 1990 Loan Collateral Report, it would not have gone ahead with the transaction. Davis Aff. ¶ 27; Affidavit of Mark Littman, sworn to on January 13, 1992 ("Littman Aff."), ¶ 10.

In support of Morrell's claims, Mr. Davis asserts that during the October 1, 1990 Stern–Mayberry–Frieze telephone conference, it was decided not to disclose the discrepancy in the August 31, 1990 Loan Collateral Report to Morrell. Davis Aff., ¶¶ 25–26. Mr. Davis was not present during that conversation, and none of the affidavits or exhibits submitted provides any support for his conclusory statement.

Morrell also supplied transcripts of two telephone conversations which took place on October 3, 1990, the day after the closing, one between Mr. Littman and Mr. Stern, and the other between Mr. Littman and Mr. Leibovitz of Dinner Bell. Nowhere in those conversations do Mr. Stern or Mr. Leibovitz indicate that Congress had knowledge prior to the closing that the priced inventory reported on the Loan Collateral Reports was in fact overstated by Dinner Bell. As reflected in those conversations, Congress' concern prior to the closing appears to have been whether the possibility that Dinner Bell had overpriced its product inventory on the Loan Collateral Reports meant that there were insufficient secured assets at Dinner Bell for Congress

---

6. For purposes of this motion, the Court deems Morrell's answer amended to conform with the allegations set forth in connection with this motion.

7. This would mean that Congress was effectively guaranteeing the Co–Pack arrangement.

to enter into the extension of credit reflected in the Financing Amendment.[8]

Congress denies having entered into any agreement with Morrell, oral or otherwise, regarding the continued financing of Dinner Bell. Stern Rep. Aff. ¶ 7. The Congress/Morrell Agreement, which is a fully integrated document,[9] contained no provision that Congress would continue to finance Dinner Bell after the closing at a loan level comparable to the pre-closing level. Furthermore, it is undisputed that at no time did Congress breach the terms of the revolving credit facility or the Financing Amendment with Dinner Bell.

Morrell argues that Congress did not disclose the discrepancy in the August 31, 1990 Loan Collateral Report because it was eager to have Morrell enter into the various arrangements, because "[w]ith Morrell's deep pocket now involved, Congress could be sure its loans to Dinner Bell ... would be fully repaid by Morrell." Def. Mem. at 3. As a preliminary matter, the Court notes that there is no evidence to support this position and that Morrell's premise is illogical. Congress was an asset-based lender, and thus secured by its liens on Dinner Bell's accounts receivable and inventory. There has been no showing that Congress benefitted in any way from the closing of the Dinner Bell–Morrell transaction, and Congress obtained no payments from Dinner Bell or Morrell at the October 2, 1990 closing.

## DISCUSSION

### I. STANDARD FOR SUMMARY JUDGMENT

"Summary judgment is appropriate when, after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Horn & Hardart Co. v. Pillsbury Co.*, 888 F.2d 8, 10 (2d Cir. 1989). The substantive law governing the case[10] will identify the facts that are material, and "[o]nly disputes of fact that might affect the outcome of the suit under governing law will properly preclude entry of summary judgment ..." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

The movant for summary judgment "always bears the initial responsibility of informing the district court of the basis for the motion" and identifying which materials "demonstrate the absence of a genuine issues of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Once this showing has been made, the burden then shifts to the non-movant who "must set forth facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at

---

**8.** The affidavits also reflect that in August 1990, Congress questioned Dinner Bell's chief financial officer about a product inventory item on the Loan Collateral Reports termed "EST. NOT TAKEN." This item, valued at about $500,000, represented inventory in transit to Dinner Bell. When Congress was unable to verify those amounts, it told Dinner Bell that inventory in transit was no longer eligible as loan collateral. Accordingly, the parties agreed to reduce Dinner Bell's eligible product inventory at a rate of $20,000 per day. By October 2, 1990, the "EST. NOT TAKEN" item had been reduced to $60,000. Stern Rep. Aff. ¶ 18.

With regard to this inventory adjustment, Mr. Littman states, "Congress was aware of an inventory discrepancy at least as early as August, 1990." Littman Aff. ¶ 8. There is, however, no basis in the record for this assertion. The "inventory discrepancy" upon which Morrell bases its affirmative defenses and counterclaims is the discrepancy in the August 31, 1990 Loan Collat-

eral Report, a matter different from and unrelated to the August inventory adjustment. There is no evidence that information regarding the August inventory adjustment was concealed from Morrell. Not revealed, however, is the extent to which this adjustment accounted for the August 31, 1990 discrepancy between Dinner Bell's internal inventory report and its Loan Collateral Report.

**9.** Paragraph 6 of the Congress/Morrell Agreement provides:

This Agreement sets forth the entire agreement of the parties hereto with respect to the subject matter hereof. Neither this Agreement nor any term hereof may be changed, modified, altered, waived, discharged or terminated except by written instrument executed by the party to be charged.

Stern Aff., Exh. E.

**10.** The parties agree that the substantive issues in this case are governed by New York law.

250, 106 S.Ct. at 2511. "Conclusory allegations will not suffice to create genuine issues of material fact. There must be more than a scintilla of evidence and more than some metaphysical doubt as to the material facts." *Delaware & Hudson Ry. v. Consolidated Rail Corp.*, 902 F.2d 174, 178 (2d Cir.), *cert. denied,* — U.S. ——, 111 S.Ct. 2041, 114 L.Ed.2d 125 (1990) (citations omitted).

## II. CONGRESS' CLAIM FOR $1,876,809.31

In support of its motion for summary judgment, Congress presents a detailed accounting of the goods received by Morrell and its customers and the credits and adjustments which have been applied, leaving a balance due of $1,876,809.31. Stern Aff. ¶¶ 18–20. Morrell has not presented any affidavit, deposition or other evidence showing that the products were not received, that the balance claimed by Congress has been paid, or that Congress' accounting is inaccurate. Rather, in its Statement pursuant to Local Rule 3(g), counsel for Morrell provides bare denials, unsupported on this motion by any affidavit or other evidence. Such conclusory allegations do not create a genuine issue of fact precluding summary judgment. *Delaware & Hudson Ry.*, 902 F.2d at 178. Congress' motion for summary judgment must therefore be granted unless Morrell has a valid affirmative defense or counterclaim offsetting or invalidating Congress' claim.

## III. "NO OFFSET" PROVISIONS

Congress argues that Morrell is barred from asserting any counterclaims or defenses against Congress because of the "no offset" provisions in the Congress/Morrell Agreement. "No offset" provisions appear in the agreement several times. First, a specific clause labeled *"No Offset"* provides, in part:

(a) Except as expressly permitted hereunder, Morrell agrees that in no event shall Morrell or any person claiming by, through, or under Morrell, assert against Congress, as the assignee of, or secured party in re-

spect of, the present and future Accounts of Dinner Bell arising from sales to Morrell or other sums payable by Morrell to Dinner Bell under the Co–Pack Agreements, *any offset, claim, counterclaim or deduction which Morrell may have against Dinner Bell* for any amounts due to Morrell from Dinner Bell for any reason, including, but not limited to amounts due Morrell pursuant to the Purchase Agreement or the Co–Pack Agreements.

Stern Aff., Exh. E, ¶ 2(a) (emphasis added). The phrase "without offset, claim, counterclaim or deduction" occurs several other times in the agreement without the modifying language "against Dinner Bell." Stern Aff., Exh. E., ¶ 3(a), 3(c).

▪ Congress argues that the "no offset" provisions were intended to bar Morrell from asserting against Congress any and all offsets whatsoever. By contrast, one of Morrell's negotiators of the contract maintains that he understood all the "no offset" provisions were intended to bar Morrell only from asserting against Congress those offsets which Morrell might have against Dinner Bell. Littman Aff. ¶ 4. Morrell asserts that because its defenses and counterclaims allege wrongdoing by Congress itself, not by Dinner Bell, these claims may be asserted despite the "no-offset" provisions.

The different interpretations asserted by Congress and Morrell raise a genuine issue of fact as to whether Morrell is barred by the "no-offset" provisions from asserting offsets or counterclaims arising from Congress' acts. Accordingly, the "no-offset" provisions are not a ground for disposing of Morrell's defenses and counterclaims, and the Court will address those defenses and counterclaims in turn.

## IV. FRAUD

The Court reads Morrell's motion papers to set forth two theories of fraud different from the position taken in its answer. The first theory is that Congress' misrepresentation or failure to disclose its knowledge of the discrepancy in Dinner Bell's August

31, 1990 Loan Collateral Report constituted fraud in light of the alleged oral agreement by Congress to continue financing Dinner Bell after the closing at a loan level comparable to the pre-closing level. The second theory is that, notwithstanding the alleged oral agreement, Congress' misrepresentation or failure to disclose its knowledge of the discrepancy in the August 31, 1990 Loan Collateral Report was fraudulent in light of the written agreements executed at the closing, and that Morrell would not have entered into the transaction had it known of the discrepancy. The two theories are addressed separately below.

## A. Fraud Based on the Oral Agreement

Morrell argues that Congress' misrepresentation or omission regarding its knowledge of the discrepancy in the Loan Collateral Report was fraudulent when considered in light of the alleged oral agreement by Congress to continue financing Dinner Bell after the closing at a loan level comparable to the pre-closing level. Congress denies having made any agreement with Morrell regarding the financing of Dinner Bell, and argues that because the parol evidence rule bars proof of the alleged oral agreement, Morrell cannot support its claim of fraud.

■ The parol evidence rule bars extrinsic evidence of a prior or contemporaneous oral agreement when offered to contradict, vary, add to, or subtract from the clear and unambiguous terms of a valid, integrated written instrument. *See, e.g., Hicks v. Bush*, 10 N.Y.2d 488, 225 N.Y.S.2d 34, 180 N.E.2d 425 (1962); *Wallace Steel, Inc. v. Ingersoll–Rand Co.*, 739 F.2d 112, 115 (2d Cir.1984). The Congress/Morrell Agreement is a valid, integrated, written agreement, and falls within the ambit of the rule. Morrell argues, however, that the parol evidence rule does not bar proof of the oral agreement because (1) evidence of the oral agreement is offered in connection with a claim of fraud, and (2) the written agreements between the parties are not contradicted by the alleged oral agreement.

■ New York law recognizes a limited exception to the parol evidence rule in actions to "*rescind* a contract on the ground of fraud." *Sabo v. Delman*, 3 N.Y.2d 155, 164 N.Y.S.2d 714, 717, 143 N.E.2d 906, 908 (1957) (emphasis in original). Parol evidence will only be admitted to show fraud where it indicates "the intention of the parties that the entire contract was to be a nullity ..." *Bersani v. General Accident Fire & Life Assur. Corp.*, 36 N.Y.2d 457, 369 N.Y.S.2d 108, 112, 330 N.E.2d 68, 71 (1975). Here, where the parol evidence is offered to modify a fully integrated agreement, one which states explicitly that it can be modified only in writing, that evidence will not be permitted. *See Hong Kong Deposit and Guaranty Co., Ltd. v. Hibdon*, 611 F.Supp. 224, 229 (S.D.N.Y.1985) (in fraud claim where parol evidence would not destroy the contract, but only modify certain provisions, no exception to parol evidence rule applies). If Morrell were permitted to offer evidence of the oral agreement, the parol evidence rule would be rendered void. Any defendant in a claim for breach of contract could avoid summary judgment merely by alleging fraud in connection with an oral agreement.

■ Morrell also claims that the parol evidence rule does not apply because the oral agreement does not contradict the terms of the written agreements between the parties. As alleged by Morrell, the oral agreement was an absolute promise by Congress to continue financing Dinner Bell after the closing at a loan level comparable to the pre-closing level. Thus, the oral agreement required Congress to provide Dinner Bell with a certain level of financing irrespective of Dinner Bell's collateral position and regardless of its loan eligibility under the Advance Formula. That agreement is plainly inconsistent with the requirement that funds be advanced pursuant to the Advance Formula, a requirement embodied in the Congress–Dinner Bell revolving credit facility and the Financing Amendment, which are referenced in the Congress/Morrell Agreement. Stern Aff., Exh. E. Furthermore, an agreement by Congress to make loans regardless of Dinner Bell's available collateral would contra-

vene ordinary and prudent business practice and would effectively make Congress a guarantor of Dinner Bell's performance under the Co–Pack Agreements. No reasonable trier of fact could accept that Congress entered into such an agreement, or that Morrell would not have required such an agreement to be in writing.

Accordingly, the parol evidence rule bars proof of the alleged oral agreement, and Morrell's claim of fraud in connection with that oral agreement must fail.

### B. Fraud Based on the Closing Agreements

Morrell's second theory of fraud appears to be that notwithstanding any oral agreement, Congress' failure to disclose the inventory report discrepancy was fraud in light of the written agreements executed at the closing. The essence of this theory, which is gleaned from Morrell's motion papers and the affidavits of Mr. Davis and Mr. Littman, is that if the four closing agreements are read together as a single integrated transaction, then Morrell relied on Congress's agreement in the Financing Amendment to continue to make financing available to Dinner Bell until November 30, 1990 (subject to the same general terms and conditions which existed prior to the closing). Thus, after the closing, Dinner Bell's eligibility for financing would be determined by reference to the Advance Formula, which in turn depended in part on the level of the priced inventory as reported in the Loan Collateral Reports. The possibility that the priced inventory in the Loan Collateral Reports was overstated meant the possibility of a reduced level of financing to Dinner Bell and reduced cash flow. Dinner Bell had long been in financial difficulty, and reduced cash flow would impact on its ability to obtain supplies from creditors, to continue production, and to comply with its obligations to Morrell under the Co–Pack Agreements. Success of the Co–Pack Agreements was an element of the transaction which was important to Morrell. Thus, Morrell argues that Congress's knowledge of a discrepancy in the inventory reported on the August 31, 1990 Loan Collateral Report was material information which would have effected its decision to enter into the transaction. Morrell charges that Congress's misstatement of or failure to disclose that information constitutes actionable fraud.

Fraud by affirmative misrepresentation, or actual fraud, and fraud by omission, or fraudulent concealment, are different causes of action and demand different elements of proof under New York law. Accordingly, Morrell's actual fraud claim and its fraudulent concealment claim are addressed separately.

### 1. *Actual Fraud*

The elements of actual fraud under New York law are a false representation, scienter, materiality, expectation of reliance, justifiable reliance, and damage. *Morse Diesel, Inc. v. Fidelity and Deposit Co. of Maryland,* 715 F.Supp. 578, 585 (S.D.N.Y.1989). *Accord Cumberland Oil Corp. v. Thropp,* 791 F.2d 1037, 1044 (2d Cir.), *cert. denied* 479 U.S. 950, 107 S.Ct. 436, 93 L.Ed.2d 385 (1986). The failure of any single element will void the claim. *Conan Properties, Inc. v. Mattel, Inc.,* 712 F.Supp. 353, 366–67 (S.D.N.Y.1989). Assuming *arguendo* that Congress made an affirmative representation to Morrell and that Morrell was damaged thereby, the other elements of actual fraud must be explored.

### a. Scienter

Fraud requires proof of "scienter," which means "knowledge of the falsity of a representation or knowing that one does not have a basis for asserting the truth of a representation with the intention that another party rely on the representation." *In re Lilco Secur. Litigation,* 625 F.Supp. 1500, 1504 (E.D.N.Y.1986). None of the witnesses from Dinner Bell, Morrell, or Congress give testimony showing that Congress had actual knowledge prior to the closing that Dinner Bell had overstated or overvalued its inventory on the Loan Collateral Reports. While Morrell charges that Congress did have actual knowledge, it has failed to adduce any direct or circumstantial evidence tending to support such a

conclusion. Nevertheless, the Court is reluctant to dismiss Morrell's claim based on an issue which depends largely on the credibility of Congress' witnesses since the issue relates to the state-of-mind of those witnesses. Accordingly, Morrell barely raises an issue of fact regarding scienter, and Morrell's fraud claim will not be dismissed on this basis.

### b. Materiality

■ The basic test of materiality is whether "a reasonable man would attach importance [to the fact misrepresented] in determining his choice of action in the transaction in question." *List v. Fashion Park, Inc.*, 340 F.2d 457, 462 (2d Cir.), *cert. denied* 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965). Morrell asserts that it would not have entered into the transaction had it known of the discrepancy in the August 31, 1990 Loan Collateral Report.

Congress maintains that it had no reason to believe that its discovery of a possible discrepancy in the priced inventory reported on the August 31, 1990 Loan Collateral Report was material information to Morrell. The closing did not involve the purchase by Morrell of Dinner Bell's inventory, and Mr. Davis admits that Morrell was "not particularly interested in the inventory levels." Davis Dep. at 22. On October 1, 1990, the day Mr. Kaminski raised the discrepancy, that discrepancy was believed to be an August discrepancy of $501,000. During August and September 1990, Dinner Bell and Congress had been writing down inventory of approximately the same amount, apparently without any impact on Dinner Bell's continued viability.[11] Furthermore, at that time Dinner Bell had accounts receivable of some $4.5 million to $5 million and inventory reported at over $3 million. Deposition of Edwin Stern of August 8, 1991 at 37. Thus, it seems unlikely that any rational trier of fact could find that the discovery of a possible discrepancy of $501,000 in priced inventory as reported on a month-old Loan Collateral Report was material information to Morrell on the day prior to the closing. Nevertheless, whether such a discrepancy was mate-rial to Morrell should be determined by a jury after hearing all of the evidence.

### c. Expectation of Reliance

The transaction at issue here involved the sale of certain assets by Dinner Bell to Morrell. Congress participated in the transaction in two limited ways. First, in the Congress/Morrell Agreement, Congress released its liens on certain assets which were being conveyed by Dinner Bell to Morrell pursuant to the Asset Acquisition Agreement. Second, in the Financing Amendment, Congress agreed with Dinner Bell to extend its asset based financing until November 30, 1990. In light of the role that Congress played, the contention that Congress expected Morrell to rely on it to advise Morrell about any possible problems with Dinner Bell's inventory level is untenable. If Morrell had wanted affirmative representations regarding Dinner Bell's inventory level, which apparently it did not, the only reasonable approach would have been for Morrell rely on Dinner Bell to provide such representations. No such representations were required of Dinner Bell in the closing agreements. Nor is there anything in those agreements indicating Congress had reason to believe that Morrell was relying on it to provide that information.

The issue of expectation of reliance highlights the implausibility of Morrell's fraud claim. Nevertheless, the Court is reluctant to dismiss Morrell's fraud claim on this failure of proof.

### d. Justifiable Reliance

■ Because Morrell had unrestricted access to the same sources of information about Dinner Bell as Congress, Morrell's claim of justifiable reliance on the alleged misrepresentations made by Congress does not stand.

The principle that access bars claims of justifiable reliance on misrepresentations is well established and has been recognized by numerous courts. For example, in *Shappirio v. Goldberg*, 192 U.S. 232, 241–42, 24 S.Ct. 259, 261, 48 L.Ed. 419 (1904), the Supreme Court stated:

---

11. See note 8, *supra*.

When the means of knowledge are open and at hand, or furnished to the purchaser or his agent, and no effort is made to prevent the party from using them, and especially where the purchaser undertakes examination for himself, he will not be heard to say that he has been deceived to his injury by the misrepresentations of the vendor.

Similarly, in *Danann Realty Corp. v. Harris*, 5 N.Y.2d 317, 184 N.Y.S.2d 599, 603, 157 N.E.2d 597, 600 (1959), New York's highest court ruled:

If the facts represented are not matters peculiarly within the party's knowledge, and the other party has the means available to him of knowing, by the exercise of ordinary intelligence, the truth, or the real quality of the subject of the representation, he must make use of those means, or he will not be heard to complain that he was induced to enter into the transaction by misrepresentations.

In *Grumman Allied Indus., Inc. v. Rohr Indus. Inc.*, 748 F.2d 729 (2d Cir. 1984), the plaintiff purchased the assets of the defendant's subsidiary, including two hand-built prototypes of a bus which later went into production. Problems later developed in production models of the bus, forcing a recall. Upon discovery that the same problems were revealed in prototype testing prior to the sale, plaintiff sued for fraud. The Second Circuit rejected the fraud claim for lack of justifiable reliance, emphasizing the plaintiff's sophistication and its unrestricted access to the misrepresented information:

We believe Grumman's claim of justifiable reliance was properly rejected by the district court in light of the undisputed evidence demonstrating that Grumman enjoyed unfettered access to Flxible's plants, personnel and documents, and that it possessed the legal, technical and business expertise necessary to make effective use of that access.

\* \* \* \* \* \*

Where sophisticated businessmen engaged in major transactions enjoy access to critical information but fail to take advantage of that access, New York courts are particularly disinclined to entertain claims of justifiable reliance.[12]

*Grumman*, 748 F.2d at 737.

Similarly, in *Marine Midland Bank v. Palm Beach Moorings, Inc.*, 61 A.D.2d 927, 403 N.Y.S.2d 15, 17 (1st Dep't 1978), in granting a motion for summary judgment, the court rejected a claim of justifiable reliance on the grounds that the defendant "had the opportunity to examine the corporate records before assuming the obligations reflected in the agreement of purchase." In such a situation, the court relied on the principle of *Dannan Realty* and rejected a claim or fraud based on misrepresentation. *See also Frigitemp Corp. v. Financial Dynamics Fund, Inc.*, 524 F.2d 275, 282 (2d Cir.1975) (rejecting claim of justifiable reliance on the ground that "if the plaintiff has been furnished with the means of knowledge and he is not prevented from using them he cannot say that he has been deceived by the misrepresentations of the other party"); *Aaron Ferer & Sons, Ltd. v. Chase Manhattan Bank, N.A.*, 731 F.2d 112, 123 (2d Cir.1984) (rejecting claim of justifiable reliance because "all of the information that plaintiffs now claim was concealed from them was either a matter of public record, was not pursued by plaintiffs, or was disclosed, at least in part," by defendant).

Morrell had unrestricted access to Dinner Bell's plants, personnel, and documents. An acquisition team of Morrell representatives arrived at Dinner Bell on August 1, 1990 to begin a pre-acquisition

---

**12.** In the written contract in *Grumman,* the plaintiff "made specific disclaimers of reliance on [the defendant's] representations concerning the testing of the [prototype]." 748 F.2d at 734. Here, however, Congress was not the seller of the assets conveyed in the transaction or of the products sold pursuant to the Co–Pack Agreements. In the two contracts it signed, Congress made no representations concerning inventory or level of financing. Morrell did not require Congress to verify in part or in whole Dinner Bell's financials or inventories which were made part of the Asset Acquisition Agreement. Accordingly, no disclaimer of reliance by Morrell was called for.

review. Davis. Dep. at 14; Frieze Dep. at 37. Morrell does not deny that:

> The acquisition team was given unlimited access to the Dinner Bell facilities as well as its books and records. Those records included financial reports consisting of income statements, balance sheets, working capital statements, accounts payable records, etc., as well as agreements between Dinner Bell and Congress and the loan collateral reports.
>
> \*   \*   \*   \*   \*   \*
>
> Dinner Bell representatives supplied the Morrell acquisition team with copies of any and all Dinner Bell books and records that Morrell requested.

Pl. 3(g) Stmt. ¶¶ 25–26.

The undisputed evidence also shows that Morrell is a sophisticated entity which possessed the ability and expertise to make effective use of that access. Morrell is a large corporation with annual sales of approximately $1.8 billion. Its parent corporation, Chiquita Brands International, has annual sales in excess of $4 billion. Pl. 3(g) Stmt. ¶ 3. The Morrell acquisition team consisted of between 10 and 20 people, was headed by Mr. Davis, then the Director of Operations Support for Morrell, and included "financial people, operations people, and salespeople." Davis Dep. at 14; Frieze Dep. at 37. Morrell also had two separate teams observing Dinner Bell's year-end inventory. Pl. 3(g) Stmt. 35–36.

Thus, Morrell had access to the allegedly misrepresented information and the ability to utilize that access. There is no evidence suggesting that Congress participated in the overstatements of inventory by Dinner Bell's former chief financial officer, or that Congress in any way interfered with Morrell's ability to discover that information. In such a situation, Morrell cannot show justifiable reliance, and it's actual fraud claim is deficient.

### 2. *Fraudulent Concealment*

■ The elements of fraudulent concealment under New York law are a relationship between contracting parties that creates a duty to disclose, knowledge of material facts by a party bound to make such disclosures, nondisclosure, scienter, reliance, and damage. *Leasing Service Corp. v. Broetje,* 545 F.Supp. 362 (S.D.N.Y. 1982). Because Morrell cannot show that Congress had a duty to disclose the discrepancy in the August 31, 1990 Loan Collateral Report, its fraudulent concealment claim must be rejected as a matter of law. *Chiarella v. United States,* 445 U.S. 222, 235, 100 S.Ct. 1108, 1118, 63 L.Ed.2d 348 (1980) ("when an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak").

■ Under New York law, a duty to disclose material facts arises (1) where there is a fiduciary relationship between the parties, or (2) where one party possesses superior knowledge, not readily available to the other, and knows that the other party is acting on the basis of mistaken knowledge. *Aaron Ferer & Sons,* 731 F.2d at 123. Morrell does not argue that there was a fiduciary relationship between it and Morrell, but instead relies on the second theory, often termed the "special facts" doctrine. *See Chiarella,* 445 U.S. at 248, 100 S.Ct. at 1124.

In *Beneficial Commercial Corp. v. Murray Glick Datsun, Inc.,* 601 F.Supp. 770, 773 (S.D.N.Y.1985), the court explained the special facts doctrine, noting:

> the growing trend to impose a duty to disclose in many circumstances where silence used to suffice; Steps have been taken toward application of the "special facts" doctrine in a broader array of contexts where one party's superior knowledge of essential facts renders a transaction without disclosure inherently unfair.

*Id.* (citing *Chiarella,* 445 U.S. at 248, 100 S.Ct. at 1124). Morrell relies on *Gaines Service Leasing Corp. v. Carmel Plastic Corp.,* 105 Misc.2d 694, 432 N.Y.S.2d 760 (Civ.Ct., Kings Cty.1980), *aff'd* 113 Misc.2d 752, 453 N.Y.S.2d 391 (App.Term.1981). There, mistakenly believing that payment in full had been received, the plaintiff's employees delivered a van to the defendant. The defendant accepted delivery of the van but refused to pay the balance due. Relying on the special facts doctrine, the

court held that the defendant had breached its duty of disclosure:

> The equal availability to both sides of the facts as to payment in the present case does not excuse defendant's silence. For defendants had to know plaintiff was relying on a basic misconception. Nor could plaintiff's error be seen by defendants as a matter of judgment or opinion. The only intention consistent with defendant's action was the fraudulent one which the jury found.
>
> \* \* \* \* \* \*
>
> It is no longer acceptable, if ever it was, to conclude in knowing silence, a transaction damaging to a party who is mistaken about its basic factual assumptions when, like the present plaintiff, he "would reasonably expect a disclosure."

432 N.Y.S.2d at 762–63 (citations omitted). Morrell argues that like the defendant in *Gaines,* Congress concluded the transaction with Morrell in "knowing silence," while Morrell was mistaken about a "basic factual assumption" which it reasonably expected Congress would disclose.

Morrell also relies on *Heineman v. S. & S. Machinery Corp.,* 750 F.Supp. 1179 (E.D.N.Y.1990), where the court accepted the rationale of *Gaines,* holding that defendants had a duty to disclose information regarding the financial stability of a company which was acquiring an 80% share of plaintiff's company and assuming 80% of its outstanding debt. Similarly, Morrell claims that because Congress knew that Morrell would rely upon Congress' inventory audit of Dinner Bell,[13] as well as Congress' detailed examination of Dinner Bell's collateral through the duration of the revolving credit facility, Congress had a duty to disclose its representative's inability to reconcile the discrepancy in the August 31, 1990 Loan Collateral Report.

Three specific elements must be shown to invoke the special facts doctrine: (1) one party must have superior knowledge, (2) that knowledge must not be readily available to the other party, and (3) the party with the knowledge must know that the other party is acting on the basis of mistaken knowledge. *Aaron Ferer & Sons,* 731 F.2d at 123. Failure of any single element bars application of the doctrine.

In *Grumman,* for example, because the plaintiff had access to the alleged omitted information, the court rejected plaintiff's claim of a duty of disclosure. The court noted, "In light of the unrestricted access to Flxible's facilities, personnel and records, as well as Grumman's arsenal of legal and technical talent, we find the claim that Rohr possessed superior knowledge (that was not readily available to Grumman) to be without merit." 748 F.2d at 739.

In *Frigitemp,* a corporation and certain of its shareholders alleged fraud against purchasers of stock based on the purchasers' alleged failure to disclose the amount of stock they held and their intent to purchase most of the stock issued in a certain offering. The court found that the purchasers did not have a duty to disclose information regarding their holdings because that information was available in the corporation's records. That availability entitled the purchasers to assume that the plaintiffs were not acting on the basis of mistaken knowledge. Without notice that the plaintiffs were acting on a mistaken belief, there was no duty of disclosure under the special facts doctrine. 524 F.2d at 282–83.

In *Aaron Ferer & Sons,* the court rejected an argument that there was a duty of disclosure based on superior knowledge "because all of the information that plaintiffs now claim was concealed from them was either a matter of public record, was not pursued by plaintiffs, or was disclosed, at least in part, by [defendant]." *See also United States Steel & Carnegie Pension Fund, Inc. v. Orenstein,* 557 F.2d 343, 345 (2d Cir.1977) (sustaining dismissal of securities fraud claims where plaintiff was in a position to discover the allegedly withheld

---

**13.** The Court can find no factual basis for the assertion that Congress conducted an inventory audit of Dinner Bell. The evidence shows only that a Congress representative, as well as two teams of Morrell representatives, observed Dinner Bell's year-end inventory.

information; customer contracts and regularly prepared account control documents were available for inspection and plaintiff simply failed to review them).

■■■ As in *Grumman, Frigitemp, Aaron Ferer & Sons,* and *Orenstein,* Morrell cannot make out all of the required elements of the special facts doctrine. As noted above, Morrell had unrestricted access to all Dinner Bell books and records, facilities, and personnel. Where Morrell had such access and the means to utilize that access, but failed to exercise diligence to discover the allegedly omitted information, Congress had no duty of disclosure, and Morrell cannot claim fraudulent concealment.

## V. NEGLIGENT MISREPRESENTATION

■■■ Based on the same facts set forth in connection with its fraud claim, Morrell charges Congress with negligent misrepresentation. New York courts do not recognize a cause of action for negligent misrepresentation in the absence of a special relationship of trust or confidence between the parties. *Accusystems, Inc. v. Honeywell Information Systems, Inc.,* 580 F.Supp. 474 (S.D.N.Y.1984). *Accord American Protein Corp. v. AB Volvo,* 844 F.2d 56, 63–64 (2d Cir.), *cert. denied* 488 U.S. 852, 109 S.Ct. 136, 102 L.Ed.2d 109 (1988). Morrell argues that a special relationship existed between Morrell and Congress because Morrell relied on Congress's promises in the oral agreement and in the Financing Amendment to continue the financing of Dinner Bell. Proof of a special relationship as embodied in the oral agreement between Congress and Morrell is barred by the parol evidence rule. The Financing Amendment between Congress and Dinner Bell is also insufficient to constitute a "special relationship" between Congress and Morrell.

■■■ Courts generally find that an ordinary contractual relationship alone is insufficient to constitute a special relationship. *See Accusystems, supra.* The special relationship implying a closer degree of trust, confidence, or reliance, is generally a previous or continuing relationship between the parties. *See Rosen v. Spanierman,* 711 F.Supp. 749, 758 (S.D.N.Y.1989). The relationship allegedly contemplated in the Financing Amendment was between Congress and Dinner Bell as borrower and lender, with Morrell, at most, as a third-party beneficiary. Banking relationships (i.e. that between Dinner Bell and Congress) are generally not viewed by courts as special relationships giving rise to a heightened duty of care. *See Aaron Ferer & Sons,* 731 F.2d at 122 (under New York law the usual relationship of a bank and customer is not a fiduciary relationship, but one simply of debtor and creditor); *In re W.T. Grant Co.,* 699 F.2d 599, 609 (2d Cir.), *cert. denied* 464 U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983) (relationship of debtor and creditor did not lead to a duty of disclosure); *Banco Espanol de Credito v. Security Pacific Nat'l Bank,* 763 F.Supp. 36, 45 (S.D.N.Y.1991) (no fiduciary relationship in arms-length loan participation transactions between large financial institutions unless created in the participation agreement).

Furthermore, where a future relationship between the parties is the basis of a special relationship, the duration of that relationship must generally be long term. *Coolite Corp. v. American Cyanamid Co.,* 52 A.D.2d 486, 384 N.Y.S.2d 808 (1st Dep't 1976) (long-term distributorship agreement); and *Mathis v. Yondata Corp.,* 125 Misc.2d 383, 480 N.Y.S.2d 173 (Sup.Ct., N.Y.Cty.1984) (long-term service contract). The Financing Amendment would have been effective for only 60 days, too short a period to constitute a long-term relationship.

In support of its claim, Morrell relies primarily on *Banker's Trust Co., Co. v. Steenburn,* 95 Misc.2d 967, 409 N.Y.S.2d 51 (Sup.Ct.Chatauqua Cty.1978), *aff'd* 70 A.D.2d 786, 418 N.Y.S.2d 723 (4th Dep't 1979); *White v. Guarante,* 43 N.Y.2d 356, 401 N.Y.S.2d 474, 372 N.E.2d 315 (1977; *Coolite Corp., supra;* and *Mathis, supra.* In each of these cases, the court found a special relationship sufficient to support a claim of negligent misrepresentation. An examination of these cases highlights the

weakness of Morrell's claim. *See Sanitoy, Inc. v. Shapiro*, 705 F.Supp. 152, 155 (S.D.N.Y.1989).

In *Banker's Trust*, the court found a special relationship between a bank and a borrower where there was an agreement to lend funds confirmed by the bank's executive vice-president. After the borrowers formed a corporation and incurred substantial personal indebtedness in reliance on the bank's promise, the bank refused to make the agreed upon loans. The court concluded there was a special relationship, in part because the bank officer had actively solicited the borrower's business, and the borrower had sought the bank officer's "advice and assistance." 409 N.Y.S.2d at 67. Here, by contrast, there is no suggestion that Congress had any role in inducing Morrell to purchase Dinner Bell's assets or that Morrell sought out or relied upon Congress' advice or counsel. Rather, the evidence reveals two sophisticated parties bargaining at arms-length for individual protection.

In *White*, the court found a special relationship between a limited partner of a partnership and the partnership's accounting firm. The ruling was based largely on the court's finding that the accountants owed a duty of care to third-party beneficiaries of the service contract to audit the partnership. 372 N.Y.S.2d at 320. The issue before the *White* court, therefore, was whether to extend a recognized fiduciary duty to include limited partners. Here, by contrast, there is no allegation that Congress owed a fiduciary duty to Dinner Bell which could be extended to apply to Morrell. In fact, the evidence supports the conclusion that because Congress and Dinner Bell were parties to an arms-length transaction, there was no fiduciary relationship. *See Compania Sud–Americana de Vapores, S.A. v. IBJ Schroder Bank & Trust Co.*, 785 F.Supp. 411, 426 (S.D.N.Y. 1992).

In *Coolite*, the court found a special relationship between a distributor and a distributee because the defendant had required the plaintiffs to form a new company before agreeing to enter a long term distributorship agreement. The court found that the plaintiff's investment of $500,000 attested that the parties relationship was "intrinsically a more intimate relationship association, at least in terms of reliance and trustworthiness, than that of the commonly encountered buyer and seller." 384 N.Y.S.2d at 811. By contrast, the alleged agreement here did not require any additional effort or investment by Morrell which would indicate that Congress' relationship was "more intimate" than the ordinary contractual relationship.

*Mathis* can also be distinguished. There, the defendants had agreed to supply the plaintiffs with data processing services. A year later, defendants attempted to induce the plaintiffs not to cancel the contract by promising to sell them computer equipment and to develop software necessary for the plaintiffs' business. The court held that the promises, representations, and warranties related to this long-term service contract created a special relationship between the parties. 480 N.Y.S.2d at 178. Here, Morrell does not even allege the existence of a long-term relationship accompanied by detailed warranties and representations from Congress.

Accordingly, because there is no evidence that the Congress–Morrell relationship was a special relationship with a closer degree of trust and confidence than the ordinary contractual relationship, Morrell's claim of negligent misrepresentation is denied as a matter of law.

## VI. VIOLATION OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

In *Cross & Cross Properties, Ltd. v. Everett Allied Co.*, 886 F.2d 497, 502 (2d Cir.1989), the Second Circuit stated:

Courts applying New York law repeatedly have recognized the duty of good faith and fair dealing, the "implied obligation to exercise good faith not to frustrate [a] contract into which [one has] entered." Since the duty of good faith and fair dealing is implied in every contract, contracting parties' fields of discretion under a contract are bounded by the par-

**476**

ties' mutual obligation to act in good faith. The boundaries set by the duty of good faith are generally defined by the parties' intent and reasonable expectations in entering the contract (citations omitted).

Morrell argues that it was improper for Congress to enter into the Congress/Morrell Agreement having conveyed to Morrell the understanding "both in numerous conversations and in explicit written agreements" that Congress would continue to extend financing to Dinner Bell, while Congress knew that it would drastically reduce that financing the day after the closing. Def. Br. at 21. Morrell asserts that such behavior deprived it of the benefits of the transaction and constituted a breach of the implied covenant of good faith and fair dealing in the Congress/Morrell Agreement.

To the extent that Morrell's claim relies on promises made by Congress in the alleged oral agreement, proof of that claim is barred by the parol evidence rule. To the extent that Morrell's claim relies on promises made by Congress in the Financing Amendment, it is equally deficient. In *Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.*, 716 F.Supp. 1504 (S.D.N.Y.1989), the court refused to apply the implied covenant of good faith in an indenture to create additional benefits which were not bargained for the express agreement between the parties. The court held:

> While the Court stands ready to employ an implied covenant of good faith to ensure that such bargained for rights are performed and upheld, it will not, however, permit an implied covenant to shoehorn into an indenture additional terms plaintiffs now wish had been included.

716 F.Supp. at 1519. Likewise, here Morrell attempts to transform the implied covenant in the Congress/Morrell Agreement into an additional promise by Congress to continue to make loans to Dinner Bell irrespective of Dinner Bell's collateral position. That simply was not a term bargained for in the written agreement between the parties. All Congress agreed to do in the Financing Amendment was to continue to make funds available to Dinner Bell pursu-

ant to the Advance Formula. There is no allegation that Congress breached that agreement. Accordingly, Morrell's claim must be rejected as a matter of law.

## CONCLUSION

Because no reasonable trier of fact could find in favor of Morrell with regard to its defenses and counterclaims, Congress' motion for summary judgment on its claim for $1,876,809.31 is granted.

IT IS SO ORDERED.